Douglas J. Pick
Eric C. Zabicki
**PICK & ZABICKI LLP**
Counsel to Rand International Leisure Products, LLC
369 Lexington Avenue, 12th Floor
New York, New York 10017
(212) 695-6000
dpick@picklaw.net

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 7 (Involuntary) |
| RAND INTERNATIONAL LEISURE PRODUCTS, LLC, | Case No. 10-71497(AST) |
| | Docket No.: |
| Alleged Debtor. | |

-------------------------------------------------x

## ALLEGED DEBTOR-APPELLANT'S EMERGENCY MOTION FOR STAY PENDING APPEAL AND FOR A TEMPORARY RESTRAINING ORDER

TO THE HONORABLE JUDGES OF THE
UNITED STATES DISTRICT COURT:

Rand International Leisure Products, LLC ("Rand"), the alleged debtor in the above-captioned involuntary chapter 7 bankruptcy case and the appellant in the appeal more fully discussed herein, by and through its undersigned counsel, as and for its emergency motion (the "Motion") for entry of an Order, pursuant to Rule 8005 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (a) staying entry of an Order for Relief under any chapter of title 11 of the United States Code (the "Bankruptcy Code") against Rand pending the outcome of Rand's appeal (the "Appeal") to this Court from a certain *Order for Relief* entered by the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") on September 7, 2010, Honorable Alan S. Trust, United States Bankruptcy Judge, presiding (the "Order", a copy of which is

1

attached hereto as *Exhibit "A"*); (b) granting a temporary restraining order of the entry of an Order for Relief under any chapter of the Bankruptcy Code against Rand to the extent necessary to permit this Court to hear and determine the Motion; and (c) granting Rand such other and further relief as this Court may deem just and proper, respectfully represents and alleges as follows:

## OVERVIEW

1.      By way of the Order, the Bankruptcy Court denied Rand's request to dismiss the Amended Involuntary Petition (the "Amended Involuntary Petition") and directed that an Order for Relief against Rand under chapter 7 of the Bankruptcy Code be entered on September 20, 2010 if Rand failed to elect to convert its case to one under chapter 11 of the Bankruptcy Code.  Rand's request for a stay pending appeal (identical to the stay sought herein) was made, and denied, by the Bankruptcy Court on August 31, 2010 which is reflected in the Order.[1]  On September 9, 2010, Rand filed a Notice of Appeal from the Order to this Court.

2.      Rand respectfully submits that a stay pending the outcome of the Appeal should be granted because all of the factors supporting a stay are present.  Specifically:

(a)      Failure to grant a stay as requested would result in irreparable and immediate harm to Rand and its creditors in the form of the immediate termination of its operations and the appointment of a Chapter 7 Trustee to liquidate all of Rand's assets.  Century Sports Inc., a Petitioning Creditor and an entity controlled by Allen Goldmeier and his brother Steven (collectively, the "Goldmeiers"), has asserted a lien against all of Rand's assets. The Goldmeiers have acknowledged that they will not consent to Rand's use of cash collateral if the Debtor were to convert its case to a chapter 11 reorganization negating Rand's ability to operate as a chapter 11 debtor-in-possession.  The Goldmeiers have further acknowledged that there is no likelihood of any distribution to Rand's unsecured creditors if Rand were

---

[1]      A full copy of the transcript of the August 31, 2010 "ruling conference" is attached hereto as *Exhibit "B"*.  Citations herein to said transcript will be in the form of TR at [p. ___ - p. ____].  The transcripts of the two days of trial are voluminous and will be provided to the Court upon request.

liquidated under chapter 7. Thus, in the event that an Order for Relief is entered prior to a determination on Rand's Appeal, the outcome of the Appeal would be rendered moot;

(b)     There is a high probability of success on the merits of the Appeal because the entry of the Order was premised upon incorrect factual findings and legal conclusions made by the Bankruptcy Court including:

(i)     The Bankruptcy Court's erroneous holding that, contrary to the express language of §303(b)(1) of the Bankruptcy Code, that no bona fide dispute as to liability or amount could be found in instances where Rand's books and records reflected an amount owed that was greater than what was being claimed by certain Petitioning Creditors. At a minimum, said issue is one of first impression in this Circuit on which this Court should weigh-in;

(ii)     The Bankruptcy Court also erroneously held that the Goldmeiers' solicitation of all of the Petitioning Creditors was permissible, even though the Goldmeiers were insiders of Rand and Allen Goldmeier was a sitting member of Rand's Board of Managers and even though said solicitation was conducted without any consultation with or approval of the Board of Managers;

(iii)     The filing of the Involuntary Petition followed by the Amended Involuntary Petition,[2] represented a "bad faith" filing because, among other things, it constituted an improper "forum shopping" strategy employed by the Goldmeiers to seek an immediate resolution of a two-party dispute,[3] a

---

[2] As hereinafter discussed, the Amended Involuntary Petition was filed on May 14, 2010, *eight days after Rand had filed its Motion for Summary Judgment*. At that time, three of the Petitioning Creditors had motions pending before the Bankruptcy Court seeking to withdraw from the Involuntary Petition. The three Petitioning Creditors acknowledged that their respective claims were in dispute *and that the Goldmeiers had directly solicited them to sign the Involuntary Petition with promises of, inter alia, the payment of all associated legal fees*. Each of the three Petitioning Creditors further acknowledged having conducted no due diligence prior to signing the Involuntary Petition. No responsive papers were ever filed in connection with those motions. Ultimately, a fourth Petitioning Creditor requested that it also be permitted to withdraw from the Involuntary Petition. A fifth Petitioning Creditor subsequently refused to participate in the trial, apparently for similar reasons.

[3] In fact, on March 1, 2010, in an e-mail to Ellen Liu of Petitioning Creditor Sales Chief Ent. (Hong Kong) Co., Ltd., Allen Goldmeier had made it explicitly clear what his motive was in soliciting petitioning creditors: *"To push him into bankruptcy we need other creditors other than the Goldmeiers to sign the petition to make it less contestable process"*. On March 22, 2010, Allen Goldmeier e-mailed to Ellen Liu as follows: *"In the mean time if Rand gets Chapter 7, I can finally get him out of my building and it also ends the dispute on our non-compete contracts. The Goldmeiers*

satisfaction that the Goldmeiers believed that they could not achieve in a pending State Court Action (hereafter defined). There was ample evidence that the bankruptcy proceedings would not benefit any of Rand's legitimate, non-insider creditors.  Indeed, if an Order for Relief under chapter 7 was entered and Rand was liquidated, it is beyond question that any proceeds of the estate would be entirely paid over to Century Sports, Inc. (a company controlled by the Goldmeiers) and not to any unsecured creditors of Rand. Such facts should have warranted the prompt dismissal of all proceedings in the Bankruptcy Court or, in the alternative, abstention under Bankruptcy Code §305;

(iv)     The Bankruptcy Court apparently ignored the evidence and testimony demonstrating the Goldmeiers' efforts to reacquire Rand solely for their own benefit, seize its assets, rid themselves of Mark Worksman (to whom the Goldmeiers had sold Rand only three years earlier) and start up a new company (using the Rand name) and for the purposes of avoiding their non-compete clause with Rand[4] all without the creditors of Rand receiving any money.    Such efforts and intent were further evidenced by, *inter alia*, the Goldmeiers' commencement of the State Court Action, the commencement of Landlord/Tenant proceedings by the Goldmeiers to evict Rand from its business premises and the Goldmeiers' own deposition testimony.  Having suffered a major setback in the State Court Action and the Landlord/Tenant proceedings, the Goldmeiers concentrated their efforts towards shutting Rand down, believing that Rand could not possibly survive relief in chapter 11 without the Goldmeiers' consent to Rand's use of cash collateral and the Goldmeiers' belief that they could control any creditors' committee that might be appointed in a chapter 11 case.   The mere fact that certain of Rand's creditors chose (with promises of continued business and the payment of all legal fees) to join the Goldmeiers in their quest should have been of no moment to the Bankruptcy Court;

---

*could start a new life although continue lawsuits with Worksman".*

[4] On October 27, 2008, counsel for Rand had sent a letter (via Federal Express) to the Goldmeiers reminding them of the restrictive covenants set forth in the April 23, 2007 Asset Purchase Agreement and their respective Employment Agreements precluding them from directly or indirectly owning, managing, operating or participating in any business with Rand for five (5) years.

4

(v)    In signing the Involuntary Petition and, thereafter, the Amended Involuntary Petition, as well as in their testimony in open court, all of the Petitioning Creditors had testified that they had conducted absolutely no independent verification whatsoever as to the truth of any of the allegations set forth in the Involuntary Petition and/or the Amended Involuntary Petition, but rather relied solely on the representations and promises made to them by the Goldmeiers;

(vi)    The Bankruptcy Court committed reversible error when it went beyond a mere fide determination of whether a bona fide dispute existed concerning the Petitioning Creditors' respective claims, but also looked at the underlying evidence in an attempt to resolve/adjudicate the multiple disputes highlighted by Rand.  In this regard, the Bankruptcy Court made numerous factual errors including finding that a valid written lease between Rand and Executive Importers, LLC existed when that fact was clearly in dispute;

(vii)    In denying Rand's Motion for Summary Judgment, the Bankruptcy Court, ignored all of the evidentiary objections made by Rand in connection with the declarations filed by the Petitioning Creditors and ignored the fact that the Petitioning Creditors had failed to file a Counter Statement of Undisputed Facts in opposition to said motion;

(viii)    The Bankruptcy Court also committed reversible error by permitting a representative of Petitioning Creditor Sales Chief Ent. (Hong Kong) Co., Ltd. to testify at trial using a "personal friend" as her interpreter (rather than an independent, court-approved interpreter).[5] 6/25/10 TR at p. 148, lines 1-8). This gross oversight is amplified by the fact that the witness had filed a personal trial declaration in English, that extensive e-mail communications had been introduced as evidence in which the witness wrote in clear English, and made utterances in open court further evidencing her mastery of the English

___

[5] Excerpts of Ms. Liu's trial testimony on June 25, 2010 are attached hereto as *Exhibit "C"* (the "6/25/10 Tr."). The interpreter's deficiencies are evidenced throughout the transcript. For example, see page 150 where he confused the word "assertions" with "surgeons". Also see 6/25/10 TR at p. 150, lines 22-25 (Court: "Hang on, hang on. We need a direct translation, if this is going to work of what the witness is saying") and 6/25/10 TR at p. 151, lines 1-8. On multiple occasions, the interpreter would request that the questions be "repeated" and had to be repeatedly reminded that his job was to simply translate the question and the response and repeat the answers verbatim. In certain instances, Ms. Liu's answers had to be stricken from the record.

language (*e.g.*, 6/25/10 TR at p. 152, lines 10-19 and 6/25/10 TR at p. 159, lines 11-24); and

(ix)     The Bankruptcy Court also committed reversible error by initially limiting each side to four hours of time to present and/or defend their cases and then allowed the Petitioning Creditors substantially more time while taking away time from Rand in presenting its case.

(c)     No substantial harm or prejudice would be suffered by any of Rand's creditors and/or any other parties in interest if the requested stay pending the outcome of the Appeal was granted.  To the contrary, the entry of a stay would permit Rand to continue to operate its business and to pay its creditors in the ordinary course whereas, if an Order for Relief under chapter 7 is entered, Rand's operations will immediately terminate leaving both Rand's pre and post-bankruptcy creditors unpaid.  It is not disputed, but was acknowledged by the Petitioning Creditors, that Rand's unsecured creditors would likely receive no recovery in a chapter 7 liquidation on account of the substantial secured obligations owed to the Goldmeiers and the entities under their control.  At a minimum, the balance of potential prejudices weighs heavily in favor of Rand as it stands to lose all of its assets and operations if an Order for Relief under chapter 7 is entered prior to a determination on its Appeal; and

(d)     Rand respectfully submits that the public interest is not implicated in the instant case.  However, because of the extraordinary ramifications of the entry of an involuntary Order for Relief under chapter 7 of the Bankruptcy Code, it would seemingly be within the best interests of public policy and in the best interest of the creditors of Rand to stay such an Order so as to permit a comprehensive review of the basis upon which this Order was signed.

## PROCEDURAL BACKGROUND

3.     On March 8, 2010, Century Sports, Inc, Executive Importers, LLC (each of which is owned by the Goldmeiers), and nine (9) other alleged creditors of Rand (*i.e.*, (i) Matang Gonzales; (ii) G Squared Promotions Ltd.; (iii) KKG, Inc. d/b/a Kendal King Group; (iv) Club Marketing Services; (v) L.V. International; (vi) Design Edge, Inc.; (vii) Sales Chief Ent. (Hong Kong) Co. Ltd.; (viii) Joseph Sandbrook; and (ix) Bargain Furniture (together, the "Petitioning

Creditors")), all literally hand-picked and all directly solicited by the Goldmeiers, filed an Involuntary Petition against Rand in the Bankruptcy Court seeking the entry of an Order for Relief under chapter 7 of the Bankruptcy Code.  On April 1, 2010, Rand filed and served its Answer to the Involuntary Petition, denying the material allegations thereof and asserting seven affirmative defenses.

        4.      Among the affirmative defenses asserted by Rand was that the Goldmeiers were incapable of signing the Involuntary Petition on account of:  (a) their failure to first schedule a special meeting of the Board of Managers of Rand to consider the extraordinary measure of seeking bankruptcy relief; (b) their failure to hold a special meeting of the Board of Managers of Rand to first obtain the consent of the Board of Mangers; (c) their failure to advise the other Board member of their unilateral decision to liquidate Rand in bankruptcy.  It was submitted that as a result of the Goldmeiers failure to obtain approval of the Board of Managers, their affiliated companies together with the other improperly solicited Petitioning Creditors were ineligible Petitioning Creditors.

        5.      Another affirmative defense asserted by Rand was that the Involuntary Petition was filed so as to forcibly resolve what could accurately be described as a "two-party dispute" between the Goldmeiers and Mr. Worksman, and to obtain an unfair advantage in the Goldmeiers' quest to regain control of Rand.  The Goldmeiers had expressly acknowledged in both their deposition testimony and by e-mails that, forcing Rand into bankruptcy would provide them with a different forum and a different judge so as to move the dispute in a direction more favorable to them, but not necessarily more favorable to Rand's creditors.

        6.      Another affirmative defense asserted by Rand was that the claims of the Petitioning Creditors' were all subject to bona fide disputes as to liability and/or amount.

7.     On May 6, 2010, Rand filed a Motion for Summary Judgment in its favor seeking to dismiss the Involuntary Petition.  The Summary Judgment Motion was supported by:

(i)    Rand's Statement of Material Facts as to which there are no Genuine Issues to be Tried Pursuant to Local Bankruptcy Rule 7056-1 dated May 4, 2010;

(ii)   Memorandum of Law in Support of Motion for Summary Judgment or, Alternatively, for Abstention Dismissing Involuntary Petition dated May 4, 2010;

(iii)  Affidavit of Sean Smith, a consultant with Getzler Henrich & Associates, LLC. duly sworn  to on May 4, 2010;

(iv)   Affidavit of Stephen M. Pinsly, managing Director of Getzler Henrich & Associates, LLC, duly sworn to on May 4, 2010;

(v)    Affidavit of James B. Zane, partner at the firm of Zane & Rudofsky, duly sworn to on April 29, 2010; and

(vi)   Affidavit of Mark Worksman, President, Chief Executive Officer and sole Member of Rand, duly sworn to on May 4, 2010.

8.     Also, on May 6, 2010, Rand had filed a motion seeking approval of three stipulations, signed by three of the initial Petitioning Creditors (Matang Gonzales, Club Marketing Services, and Design Edge, Inc.) authorizing their withdrawal from the Involuntary Petition.  Each of those entities expressly acknowledged that: (i) they had been directly solicited by the Goldmeiers to join the bankruptcy efforts; (ii) that their claims were obviously subject to a dispute with Rand; and (iii) that they conducted absolutely no independent due diligence as to the potential merits/consequences of the bankruptcy filing.   On May 28, 2010, Rand filed a second motion seeking approval of a fourth stipulation signed by Bargain Furniture, Inc., another Petitioning Creditor, requesting that it be permitted to withdraw from the Involuntary Petition and making acknowledgments identical to those of the other three withdrawing creditors concerning their

involvement with the bankruptcy filing and the disputed status of its claim.  Said motions were adjourned *sine die* by the Bankruptcy Court and no responsive papers were submitted and no Order was ever entered in connection therewith.   The Bankruptcy Court apparently ignored the representations made by the withdrawing creditors.

9.      In the interim, and on May 14, 2008 and while the Summary Judgment Motion was pending[6], and also using information gleaned from the Summary Judgment Motion and for the purposes of avoiding the need to respond to the Summary Judgment Motion[7], a document styled Amended Involuntary Petition was filed by the Petitioning Creditors. This document:

(i)     Was not signed by Petitioning Creditors Sales Chief Ent. (Hong Kong) Co., Ltd., Bargain Furniture, Inc., KKG, Inc. d/b/a Kendal King Group, L.V. International, Matang Gonzales, Club Marketing Services and Design Edge, Inc.;

(ii)    Asserted entirely different amounts and/or bases for the claims initially asserted by Petitioning Creditors Joseph Sandbrook, Executive Importers, LLC, Century Sports, Inc., the Goldmeiers and G Squared Promotions, Ltd. (Executive Importers, LLC and Century Sports, Inc. are owned, managed and controlled by the Goldmeiers)[8;] and

(iii)   Added Cookie Jar Entertainment Inc. as a Petitioning Creditor.  (Cookie Jar ultimately failed to participate in the trial and was deemed to have also withdrawn from the Involuntary Petition, becoming the fifth Petitioning

---

[6] At a pretrial conference held on April 14, 2010, counsel to the Petitioning Creditors and the Bankruptcy Court were made fully aware that Rand was preparing and intended to file a summary judgment motion with regard to the initial Involuntary Petition.

[7] On May 28, 2010, counsel to the Petitioning Creditors sought the Bankruptcy Court's determination of whether it was necessary for Petitioning Creditors to oppose Rand's summary judgment dismissing motion and if so, to request relief under Bankruptcy Rule 9006(b)(1) enlarging the time for the Petitioning Creditors to do so.

[8] The changes made by Joseph Sandbrook and G Squared Promotions Ltd. were the result of conversations/e-mails that the Goldmeiers directly had with them advising them that the amount of their respective claims in the Involuntary Petition should be changed to those reflected by Rand in the Summary Judgment Motion. Joseph Sandbrook testified that he not produce, by way of discovery demand, all documents in his possession because he didn't think they were relevant.

Creditor to withdraw from the Involuntary Petition).

10.     In response to the filing of the Amended Involuntary Petition, and on May 25, 2010, and while its Motion for Summary Judgment was *sub judice*, Rand filed a Motion to Dismiss the Amended Involuntary Petition or, alternatively, for abstention, on the basis that:

(i)     subject matter jurisdiction was lacking because all of the "current" Petitioning Creditors failed to execute the so-called "Amended Petition".  The Amended Petition appeared to incorporate (without expressly saying so) by reference many of the Petitioning Creditors who signed the initial Involuntary Petition, rather than, as Rand contended, requiring the incorporation of new verified signatures;

(ii)    there was no dispute that subsequent to the filing of Rand's Summary Judgment Motion: (i) Sales Chief Ent. (Hong Kong) Co., Ltd., Bargain Furniture, Inc., KKG, Inc. d/b/a Kendal King Group and L.V. International did not sign the solicited Amended Petition; and (ii) Joseph Sandbrook, Executive Importers, LLC, Century Sports, Inc., the Goldmeiers and G Squared Promotions, Ltd. made last-minute changes to either the amounts of their claims (*e.g.*, as hereinafter discussed the claim of G Squared is an entirely different claim) and/or the nature of their respective claims; (iii) Matang Gonzales, Club Marketing Services and Design Edge Inc. were removed from the Amended Petition; and (iv) Cookie Jar Entertainment Inc. had been added.  The consequence of all of the foregoing was that the Amended Involuntary Petition was not really an amendment at all, but rather was a "replacement" or a new involuntary petition;

(iii)   any decision by the Bankruptcy Court on the Amended Involuntary Petition prior to a ruling on the Summary Judgment Motion would cause substantial prejudice to Rand as (i) it allowed the Petitioning Creditors to attempt to improperly cure the multiple defects in the initial Involuntary Petition; and (ii) it would have resulted in a litigation of two separate petitions and defenses thereto since many of the Petitioning Creditors apparently did not agree to sign the amendment;

(iv)    the Amended Involuntary Petition was filed in bad faith[9], was utilized to

_____

[9] It is submitted that the filing of an involuntary petition as a self-serving litigation strategy could not be more readily demonstrated herein than by Allen Goldmeier in his own words in his deposition taken on May 14, 2010, a copy of which was introduced into evidence as Exhibit "L" to the Rand Trial Book, but which is excerpted in pertinent part commencing on Page 38 hereof (the very date that the Amended Petition was due and was filed).  The Rand Trial Book consists of approximately 40 exhibits used in evidence at trial and is available to be immediately provided to this Court

further a two-party litigation strategy, was motivated by an attempt to gain control of Rand, to avoid certain "non-compete" restrictions and to complete the Goldmeiers' ultimate goal of "burying" Rand so as to resurrect the very company which they sold and pocketed millions only three years earlier;

(v)     the parties' pending litigation in New York State Supreme Court should have been permitted to be brought to a conclusion and accordingly, abstention under §305 of the Bankruptcy Code was warranted; and

(vi)    the substantial and grievous harm done to Rand by the baseless filing warranted the grant of judgment under § 303(i) of the Bankruptcy Code in favor of Rand for appropriate damages.

11.     Pursuant to an Order of the Bankruptcy Court, the Petitioning Creditors' response was initially required to be filed by June 1, 2010.  Thereafter, and upon a further written request of the Petitioning Creditors, the June 1st deadline was extended by the Bankruptcy Court to June 3, 2010.  Upon yet another request by the Petitioning Creditors, the opposition due date was further extended by the Court to June 7, 2010 "by 6:00 p.m."

12.     In opposition to Rand's Summary Judgment Motion and Motion to Dismiss, the Petitioning Creditors submitted only the Declarations of: (i) Allen Goldmeier; (ii) Ellen Liu; (iii) Joseph Sandbrook; (iv) Brian Hufnagel, Esq., as counsel; and (v) Gary Kushner, Esq., as counsel, each dated June 7, 2010.  There is no dispute that the Petitioning Creditors did not file a separate counter-statement of material facts as required under Local Bankruptcy Rule 7056-1 on June 7, 2010, but rather waited until June 10, 2010 (three days later) to file said statement with the Bankruptcy Court.  It was Rand's stated position that the Court should have disregarded and disallowed the late-filed counter-statement and deemed the material facts set forth in the Rand's statement of undisputed facts admitted by the Petitioning Creditors and, as discussed below, should have found the

---

in lieu of attaching copies of the multiple referenced exhibits to this Motion.  Substantially all of the underlying facts are not in dispute.

Declarations to be deficient, for, among other reasons, having not been made on personal knowledge. The Bankruptcy Court did not respond nor address the late-filing of the counter statement of material facts nor the evidentiary objections, discussed below.

13.     In further support of Rand's Motion for Summary Judgment, and on June 11, 2010, Rand filed its objections to the respective Declarations submitted by the Petitioning Creditors. Said objections included that the Declarations were not in compliance with Bankruptcy Rule 7056(e)(1) incorporating, by reference, Federal Rule of Civil Procedure 56(e)(1), which *requires* that any supporting or opposing affidavits concerning a motion for summary judgment be made on personal knowledge, set out facts that would be admissible in evidence and show that the affiant is competent to testify on the matter stated. The Bankruptcy Court was also advised that Federal Rule of Evidence 602 provided that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter". Rand had argued that each of the Declarations clearly ran afoul of the foregoing requirements.

14.     By way of example only, the Declaration of Ellen Liu, a copy of which is attached as *Exhibit "D"*, did not satisfy any of the requirements of FRCP 56(e) and/or FRE 602 because she had stated in her Declaration that she is the "Director of Sales Chief, ENT (Hong Kong) Co., Ltd., but then failed to identify her duties or her responsibilities at Sales Chief and further failed to provide any mention of her involvement if any, in the preparation and maintenance of Sales Chief's corporate books and records upon which she relied in submitting her Declaration. Ms. Liu had also failed to disclose whether the alleged facts and circumstances set forth in her Declaration were known to her to be true and correct by her own personal knowledge or how she presumably

learned of those facts and circumstances (such as a review of Sales Chief's books and records).  Ms. Liu had also failed to acknowledge whether or not the books, records, files and/or documents of Sales Chief that she may have relied on in signing her Declaration were maintained in the ordinary course of Sales Chief's business, were prepared by persons employed by Sales Chief under her supervision or control and or whether any of the records which she might have reviewed were prepared at or about the time the event given rise to the transaction arose.  Ms. Liu also failed to properly authenticate any documents as business records or laid any appropriate foundation for her purported knowledge of the documents and figures referenced in her Declaration.  Thus, it was submitted that the statements made by Ms. Liu in her Declaration were precluded.  The same failures and objections were asserted by Rand in connection with the Declarations submitted by Allen Goldmeier and Joseph Sandbrook.  On June 18, 2010, and notwithstanding the foregoing, the Bankruptcy Court issued its Decision and Order Denying Motion for Summary Judgment, a copy of which is attached as *Exhibit "E"*.  In denying the Summary Judgment Motion, the Bankruptcy Court ignored all of the evidentiary objections and ignored the late-filed counter statement of material facts and, ultimately, ruled in pertinent part as follows:

> This Court will defer ruling on the Alleged Debtor's requests for dismissal and abstention, with the exception of the Alleged Debtor's request for dismissal under Rule 7012 of the FRBP, incorporating Rule 12 of the FRCP.  On a motion seeking dismissal under FRCP 12(b)(6) motion, a court is to accept as true all factual allegations in the complaint and draw all inferences in favor of the plaintiff.  *See Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949-50 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 55-56 (2007); *see also Caplaw Enters.,* 448 F.3d at 521.  The involuntary petition before this Court satisfies the plausibility requirement.  Thus, the motion under FRCP 12(b)(6) is denied.
>
> This Court also denies the Alleged Debtor's claim or allegation that this Court lacks jurisdiction over the involuntary petition under FRCP 12(b)(1) because it was not properly signed.  The involuntary petition has been properly signed and/or ratified.  In

13

accordance with FRCP 83 and FRBP 5005(a)(2) and 9029, this Court has established practices and procedures for the filing, signing, and verification of documents by electronic means.  *See* United States Bankruptcy Court for the Eastern District of New York General Order No. 559, Revised Electronic Means for Filing, Signing and Electronic Filing Procedures Verification of Documents (the "Electronic Order"). This Electronic Order, signed April 23, 2010, and immediately made effective, applies to all bankruptcy cases and adversary proceedings pending on or after the effective date of April 23, 2010.  Although the original involuntary petition was filed prior to the effective date of the Electronic Order, and therefore subject to the prior electronic order procedures under Revised General Order No. 473, the amended petition before the court was filed thereafter, and is signed [/s] in conformity with the Electronic Order.  Thus, the motion under FRCP 12(b)(1) is also denied.

Based upon the evidence before the Court on the nondilatory request for dismissal and the request for abstention, and the arguments made at the hearing, a plausible argument exists that this involuntary petition filing was engineered to continue what was essentially a two-party dispute between the Goldmeiers and the Alleged Debtor, and to seek relief from this forum that which was essentially denied in the state court. The parties acknowledge, and the evidence establishes, the existence of a state court litigation between the Goldmeiers and the Alleged Debtor.  *See Allen Goldmeier et al. v. Rand Int'l Leisure Prods., LLC et al.*, Index No. 1315/2010, Nassau County, New York (the "State Action").  These parties pursued motion practice before the State Court, and the Goldmeiers sought injunctive relief and orders of seizure of the alleged Debtor's assets.  After a contested hearing, the State Court issued a seventeen-page decision denying injunctive relief as sought by the Goldmeiers, and denying dismissal of the State Action as sought by the Alleged Debtor.  The Alleged Debtor asserts that denial of the injunctive relief before the state court was the catalyst for the Goldmeiers to forum shop and file the current involuntary petition before this Court.  Rather than appeal the denial of injunctive relief, the Goldmeiers have argued that the state court was wrong in its ruling, and that relief before this Court would be more expedient.

A bankruptcy court can abstain from hearing an involuntary case if the involuntary filing is essentially the result of an ongoing two-party dispute and/or abstention is otherwise appropriate under Section 305.  *See Mountain Dairies*, 372 B.R. at 634-36.  A plausible basis to consider such relief has been established.  This does not suggest, however, that the Alleged Debtor's conduct has been pristine.  This Court has been presented with evidence that, subsequent to the filing of this involuntary case, four lawsuits have been filed by the Alleged Debtor against various petitioning creditors.[10]

---

[10]  To the contrary, no evidence of any such lawsuits were submitted to the Bankruptcy Court.  Instead, the claim was made by counsel to the Petitioning Creditors at oral argument.

However, based upon the foregoing, this Court will defer on ruling on the requests for abstention and dismissal, other than under FRCP 12.

15.      A trial on the merits of the Involuntary Petition was held June 18 and 25, 2010.[11]  A ruling, read into the record, was issued on August 31, 2010.  See Exhibit "B".

16.      The August 31, 2010 decision directed that an Order for Relief be entered against Rand and also declined Rand's request that the Court abstain from entering such an Order for Relief.  In relevant part, the Court held as follows:

> The Court set a deadline of May the 21st for the alleged debtor to respond to the amended petition.  That deadline was extended by agreement of the parties and approval of the Court to May 25th.  Although the alleged debtor did move to dismiss the amended petition, it did not oppose the deletion and adding of certain petitioning creditors or the amendment in amounts sought claimed by certain petitioning creditors.
>
> * * *
>
> Cookie Jar Entertainment, which was not an original petitioning creditor but did join the involuntary, did not participate in the trial and did not comply with the Court's scheduling order prior to trial, therefore the Cookie Jar claim is not being considered by the Court in its analysis.
>
> * * *
>
> As I previously noted, Matang Gonzales, Design Edge, and Club Marketing Services were original petitioning creditors but did not sign the amended petition.  They therefore are also not being considered as petitioning creditors.
>
> * * *
>
> The Court has determined then that the following six petitioning creditors hold claims which are not subject to a bona fide dispute as to either liability or amount, none of which six creditors are asserted as holding contingent claims, nor did the Court find them to hold contingent claims:  Number one, Sales Chief, in the amended

---

[11] On June 8, 2010, the Petitioning Creditors filed an Order to Show Cause to authorize certain Petitioning Creditors to testify at the trial via videoconference.  The Court granted the request over Rand's objections and directed Rand to provide all such Petitioning Creditors, in advance, with copies of all documents it intended to use at trial with copies to be provided to counsel to the Petitioning Creditors and to the Court.  On June 18, 2010, and much to the surprise of Rand, the Goldmeiers had "quietly" arranged for each of the Petitioning Creditors to be in New York to testify at the trial in person.  Although Rand was clearly agitated by such "sharp practice", and the Goldmeiers continuing orchestration of the bankruptcy filing, the Bankruptcy Court did not comment thereon.

petition amount of $972,679.16. Number two, Joseph Sandbrook in the amount of $18,500 dollars. Number three, Executive Importers in the amount of $1,016,032.69. Number four, Century Sports, $3,331,702.41. Number five, G Squared Promotion, $38,331.21. and KKG in the amount of $51,023.78.

The Court also notes that each of these six petitioning creditors are stated by the alleged debtor in its accounts payable ledger and other evidence before the Court to be owed either the amount stated in the amended petition or, in the case of Sales Chief, to be owed more than the amount stated in the amended petition.

* * *

Mr. Worksman testified through his affidavit that Sales Chief was owed at least $1,309,602.59 and disputes the calculation by Sales Chief of its own claim. *Generally in reconciling controverting testimony of the witnesses who testify to the documentary evidence before the Court, in each instance the Court gave greater weight to the written documentation, particularly to contemporaneous written documentation submitted into evidence over any subsequent oral claims of disputation.*

The alleged debtor argued that because the amount owed to Sales Chief as reflected in its own books and records is greater than the amount Sales Chief claimed to be owed, that there is therefore a bona fide dispute as to the amount of Sales Chief's claim. *Although in 2005 Congress amended Section 303 to include a dispute as to amount as a basis for a petitioning creditor to have a bona fide dispute, it is this Court's determination that Congress did not intend nor did the statute provide that a bona fide dispute is a claim by the alleged debtor that it owes more than the claimant asserts the claim. It's the Court's view that that is not a proper statutory interpretation nor consistent with legislative intent in the revisions to Section 303(b).*"

* * *

Turning to Joseph Sandbrook, Mr. Sandbrook provided graphic design services to Rand from March 2009 through September 2009 at an agreed hourly rate of $56.25. Mr. Sandbrook originally asserted a debt of 19,800 dollars but then reduced that amount in the amended petition to 18,500. Mr. Sandbrook testified at trial that he failed to credit Rand for a check that he originally thought had bounced.

* * *

"Rand's books and records also reflect that Mr. Sandbrook is owed 18,500 dollars; that's Exhibit PP. The alleged debtor, through Mr. Worskman, claimed a bona fide dispute existed because the September 17, 2009 invoice for 1,800 dollars presented by Mr. Sandbrook is not reflected in Rand's books and records. That was paragraph 86 of Mr. Worksman's affidavit. However, Mr. Worksman also testified that Rand

believed it owed Mr. Sandbrook more than the 18,500 dollars that Sandbrook asserted was due.

* * *

*Again, with respect to a claim that a petitioning creditor is owed more than they claim, the Court rejects that as a proper analysis of Section 303 and therefore it is not a bona fide dispute. With respect to the actual amount claimed by Mr. Sandbrook, it is in harmony with the amounts reflected in Rand's own books and records. Therefore, there is no bona fide dispute.*

* * *

With respect to Executive Importers, that is a company owned by the Goldmeiers. It leases Rand the office building that Rand uses as its corporate offices. Executive Importers filed a claim originally for 1,161,560.84 and reduced that amount to $1,026,032.69, modifying the nature of its claim for being rent, real estate, taxes, and interest. It's reflected in Mr. Worksman's affidavit at paragraph 58.

* * *

In addition to the disputation which the Court has rejected as to the existence of the lease or the amounts due under the lease, Rand separately asserts that Executive Importers' claim is disputed because Rand asserts that Executive Importers agreed to reduce Rand's claim for rent – Rand's obligation for rent if Rand arranged refinancing of the building. Section or Article 2.1 of the written lease provides a written agreement between the parties to that effect.

Mr. Worksman testified that the Goldmeiers, through Executive Importers, had breached this agreement by rejecting an alleged proposal for refinance of the building. That's both at Mr. Worksman's affidavit, paragraph 59 as well as at the June 25 transcript of the trial, pages 226 to 227. Rand introduced a March 24, 2008 letter which it claims to be the proposed refinancing that Executive Importers allegedly improperly rejected. That's at Exhibit 55.

Rand does not dispute the calculated amount for the Century Sports claim. It instead asserts that Century Sports was prohibited from taking action to seek to collect on the three million dollar note because the three million dollar note was agreed to be subordinated to Wells Fargo incident to the initial sale of assets to the Rand entity. That's Mr. Worksman's affidavit, paragraph 62, as well as trial testimony.

* * *

Rand's only assertion, though, is that Century is barred from becoming a petitioning creditor because Century's rights to act is prohibited by the subordination agreement until Wells Fargo has been paid in full; Wells Fargo holding the primary obligation arising initially out of financing for the transaction under which Rand acquired the

17

assets as set out in the parties' stipulated facts.  Wells Fargo was owed a balance of approximately four million dollars.  In the trial testimony it was clear that the Wells Fargo loan was paid off in full prior to the filing of the involuntary petition in March. That is based upon Exhibits 32 and 40 as well as Mr. Long's testimony from Wells Fargo on June 25th at pages 55 through 57.  And I'll come back to the Wells Fargo loan repayment again later in my ruling.  But based on the evidence before the Court the claim of Century is not subject to a bona fide dispute either as to liability or as to amount nor is it contingent.

With respect to G Squared, G Squared was an agent for HIP Design Ltd., HIP having granted Rand a license to manufacture and distribute certain products. G Squared's amended petition claim was $38,311.21.  George Gross, the president of G Squared testified that he first became aware of the greater amount that he was owed based upon information provided by Steven Goldmeier.  He testified on June 25 at page 18 of the transcript.  That information was subsequently confirmed in the e-mail from Allen Goldmeier with respect to the amount owed.  Mr. Gross testified that he received a binder showing that he was owed $38,311.21.  He so testified that the 38,311.21 represented the amount he was owed as of December 31, 2009 and that while he is owed royalty payments, or his company is owed royalty payments for the first quarter of 2010, he has no ability to calculate the amounts owing to him until the licensee reports to him as to sales activities.  That's June 25 transcript, pages 18 and 19.

Because both the alleged debtor and G Squared agree to the amount owed as of the end of 2009 and because there's no bona fide royalty dispute as to the existence of a royalty obligation, the parties having admitted that they're unable to calculate the amount for the first quarter of 2010, but the first quarter of 2010 not being part of the G Squared claim, the Court finds that there's no bona fide dispute as to the claim of G Squared in the amended petition.

With respect to KKG, it provided retail marketing solutions to Rand and asserted an indebtedness of $51,023.78 which is the same amount reflected in Exhibit 38, the Rand accounts payable ledger.  KKG's voucher history admitted into evidence reflects the same amount, and that's Exhibit HH.

The proposed disputation of the claim is Mr. Worksman – is twofold.  First, Mr. Worksman claimed that there was a November 15 invoice of some 171,000 dollars for an incorrect amount.  That's in Mr. Worksman's affidavit, paragraph 71.  Mr. Worksman also alleged that the alleged debtor never agreed to the prices being charged in certain invoices received from KKG, which is his affidavit, paragraph 71.

However, regardless of whether that alleged dispute existed or not, the parties acted under the invoice forwarded in November of 2008, Rand having paid 120,000 dollars

under that invoice, leaving an open balance of $51,023.78, again the same amount reflected in Rand's account payable ledger, Exhibit 38.  Mr. Worksman has not provided the Court with a calculation of the amount that he asserts Rand is owed so the Court defers to the written accounts payable ledger in evidence.

\* \* \*

With respect to then to the issue of abstention, as noted at the outset, the Court does decline to exercise its discretion to abstain from the entry of an order for relief. It is clear to the court and it was clear in the summary judgment ruling that there was pre-petition litigation pending between the Goldmeier entities and the alleged debtor and that the state court had made a ruling unfavorable to the Goldmeier entities in that litigation.  However, this is not a classic two-party dispute. There are a series of other petitioning creditors involved in this involuntary.  In fact, four of the petitioning creditors are not related to the Goldmeier entities.  So even if I excluded all Goldmeier related entities there would still be more than three petitioning creditors.

\* \* \*

"From the Court's review of the extensive record made before it, it appears to the court that the Debtor and its creditors and its estate - - the alleged debtor, its creditors and its estate are better served through a Chapter 11 process than a Chapter 7 process.  The Court recognizes that the alleged debtor chooses not to see it that way and that is the alleged debtor's right.  However, the Court is - - before it enters an order for relief under Chapter 7, because the Court determines it to be in the better interest of the estate and the creditors, is going to provide a twenty-day window for the debtor to file a motion seeking relief under Chapter 11.  That deadline is by September 10, 2010.  If the debtor does not file a motion seeking relief under Chapter 11 by September 20th then on September 21st the Court will enter an order for relief under Chapter 7."

See Exhibit "B".  (emphasis added).

## FACTUAL BACKGROUND

**A.     The Proposed Acquisition of "Old Rand" and the Goldmeiers' Continuing
        Ownership/Management Interests in "New Rand"**

18.     On April 12, 2007, the Articles of Organization of Rand International Acquisition I, LLC were filed with the New York State Department of State.  The purpose of Mr. Worksman's formation of this entity was to use it as a vehicle to acquire substantially all of the

19

assets of Rand International Leisure Products, Ltd. ("Old Rand"), together with substantially all of the assets of Old Rand's affiliates, Ross Bicycles U.S.A., Ltd., A to Z Freight Forwarders Inc. and North America Cycles Ltd. (collectively the "Sellers").  Each of the Sellers was owned by the Goldmeiers.

19.     On May 1, 2007, and following the transactions described below, Rand International Acquisition I LLC changed its name to Rand International Leisure Products LLC, which is the alleged debtor herein.  On April 27, 2007, Old Rand (*i.e.*, Rand International Leisure Products, Ltd.) changed its name to Century Sports, Inc. ("Century Sports").

20.     On April 23, 2007, and following long and difficult negotiations between the Goldmeiers and Mr. Worksman's attorneys, the Goldmeiers and Worksman executed multiple documents in connection with Rand's acquisition of Old Rand and in connection with the relationship between the Goldmeiers and Rand going forward.  Among those documents was the *Operating Agreement of Rand International Acquisition I LLC* (the "Operating Agreement") (*Exhibit "A"* to the Rand Trial Book).  Pursuant to the Operating Agreement, Rand was to be managed by a two member Board of Managers consisting of Allen Goldmeier and Mark Worksman. (Operating Agreement, ¶6(a)).  The Operating Agreement further provided, in pertinent part, as follows:

> Mark Worksman shall have two (2) votes with respect to any matters that come before the Board.  Allen Goldmeier shall have one (1) vote with respect to any matters that come before the Board.
> * * *
> At all meetings of the Board, the Managers having a  majority of the votes shall constitute a quorum for the transaction of business and, unless otherwise set forth herein, the vote of a majority of the Managers entitled to vote at any meeting at which there is a quorum shall be the act of the Board.

(Operating Agreement, ¶6(a) and (e)).  The Operating Agreement further provides that regular

20

meetings of the Board shall be held at such times and at such places as shall be fixed by approval of the Board and further provided that special meetings of the Board may be called at any time by any Manager for any purpose.  (Operating Agreement, ¶6(c) and (d)).

21.     Among the powers granted to the Board of Managers was the authority to appoint officers of Rand.  Specifically, the Operating Agreement provides as follows:

> The Board shall be empowered to appoint officers (the "Officers") who may be responsible for all day-today operations of the Company, subject to the supervision of the Board and the terms and conditions of this Agreement and any employment agreement with such Officers.

(Operating Agreement, ¶6(f)).  The Operating Agreement provided that the following individuals shall serve as the officers of Rand:  (a) Mark Worksman - President and Chief Executive Officer; (b) Allen Goldmeier - Executive Vice-President; and (c) Steven Goldmeier - Executive Vice-President. Id. *Allen Goldmeier has never resigned from the Board of Managers of Rand.*

22.     Also on April 23, 2007, Rand and the Sellers executed an *Asset Purchase Agreement* (the "APA") (*Exhibit "B"* to the Rand Trial Book) pursuant to which the Sellers sold substantially all of their assets to Rand.  Rand's execution of the APA was authorized by way of a *Written Consent to Action of the Managers and Sole Member In Lieu of a Special Meeting of Rand International Acquisition I LLC* (*Exhibit "C"* to the Rand Trial Book) which was executed by Allen Goldmeier and Worksman as the Managers of Rand.

23.     The purchase price under the APA consisted of: (a) $6,912,000 in cash; (b) an *Eight Percent (8%) Senior Subordinated Secured Note* (the "Subordinated Note") (*Exhibit "D"* to the Rand Trial Book) in the amount of $3,000,000 in favor of Old Rand; and (c) the assumption of all "Liabilities": (i) arising under all "Assumed Contracts", (ii) of all "Employee

21

Benefit Plans" and (ii) "relating to each Seller's Business".  (APA), Sec. 2.5.  As collateral for the repayment of the amounts owed by Rand under the Subordinated Note, the parties entered into a *Security Agreement* dated April 23, 2007 pursuant to which Old Rand was granted a lien (which, as more fully discussed below, was subsequently subordinated to a first lien held by Wells Fargo Bank) in all of Rand's existing and after-acquired assets.  On April 17, 2007, Old Rand filed a UCC-1 Financing Statement with the New York State Department of State regarding its security interest in the assets of Rand.  Simultaneously with the foregoing, Mr. Worksman executed a *Personal Guaranty* (*Exhibit "E"* to the Rand Trial Book) and a *Power of Attorney* (*Exhibit "F"* to the Rand Trial Book) in favor of Old Rand and Mr. Worksman's 100% membership interests in Rand was placed in escrow pursuant to a *Pledge and Escrow Agreement* (*Exhibit "G"* to the Rand Trial Book).

24.     To finance its acquisition of the assets of Old Rand, and with the Goldmeiers' assistance, Rand obtained two loans from Wells Fargo Bank pursuant to a *Credit and Security Agreement* between Rand and Wells Fargo dated April 23, 2007 (the "Wells Fargo Credit Agreement") (*Exhibit "H"* to the Rand Trial Book). One of the loans consisted of a revolving credit line for up to the principal amount of $10,000,000 (the "Wells Fargo Revolving Note"), a substantial portion of which Rand used to fund the $6,912,000.00 cash portion of the purchase price.  The other loan consisted of a term note for the principal amount of $2,000,000 (the "Wells Fargo Term Note") which Rand utilized for working capital and was being repaid by Rand in monthly installments of $55,555.99 beginning May 1, 2007.  Pursuant to the Wells Fargo Credit Agreement, Rand granted Wells Fargo Bank a lien on and security interest in all of its existing and after-acquired assets.

**B.  Subordination Agreement with Century Sports, Inc.**

25.     On April 23, 2007, Old Rand (subsequently known as Century Sports, Inc.)

executed a *Subordination Agreement* (the "Subordination Agreement") (*Exhibit "I"* to the Rand Trial Book) pursuant to which it agreed to subordinate its security interest in Rand's assets to Wells Fargo and further agreed to defer repayment of principal and to accept interest-only payments on the Subordinated Note until Rand satisfied the Wells Fargo Term Note.  The Subordination Agreement also limited Old Rand's ability to file a lawsuit in connection with the Subordinate Note as follows:

> Action on Subordinated Indebtedness.  Except as otherwise permitted herein, the Subordinated Creditor will not commence any action or proceeding against the Borrower or Guarantor to recover all or any part of the Subordinated Indebtedness, or join with any creditor (unless the Senior Lender shall so join) in bringing any proceeding against the Borrower or Guarantor under any bankruptcy, reorganization, readjustment of debt, arrangement of debt receivership, liquidation or insolvency law or statute of the federal or any state government, or take possession of, sell, or dispose of any Collateral, or exercise or enforce any right or remedy available to the Subordinated Creditor with respect to any such Collateral, unless and until the Senior Lender Indebtedness has been paid in full.

 (Subordination Agreement), Sec. 6.

26.     Rand had testified that the Wells Fargo Note was never been completely satisfied and no UCC-3 Termination Statement was filed by Wells Fargo.  To date, and contrary to the Bankruptcy Court's finding to the contrary and ignoring the sworn to testimony of Mr. Worksman in his Trial Affidavit. Wells Fargo continues to demand that Rand pay it amounts in excess of $50,000 in accrued legal fees and to execute a general release of any claims that Rand may have against Wells Fargo.  As of the Petition Date, Mr. Worksman was (and is) still in communication with Wells Fargo attempting to resolve its demands.  The Bankruptcy Court ignored/disregarded Mr. Worksman's testimony in finding that Wells Fargo was paid in full.

**C.  Employment Contracts with the Goldmeiers and Non-Competition Agreement**

27.     Among the provisions of the APA were covenants restricting the Goldmeiers'

23

ability to engage in enterprises competing with Rand.  In this regard, the APA provided, in pertinent part:

> Non Competition; Non-Solicitation.   Subject to the terms of the Employment Agreements, for a period of five (5) years from and after the Closing Date no Restricted Party will, directly or indirectly, through any Person:
>
> (a)      own, manage, operate, control or participate in the ownership, management, operation or control of, or be connected as a stockholder, lender, partner, or joint venturer in any business or organization any part of which, competes with the Businesses of any of the Sellers now or during the three years prior to the Closing Date in any geographic area in which any of the Sellers conducts that Business as of the Closing Date (the "Restricted Area"); provided, however, that no owner of less than 5% of the outstanding stock of any publicly traded corporation shall be deemed to violate the terms hereof solely by reason thereof;
>
> (b)      induce or attempt to induce any customer, supplier, licensor, licensee, distributor or other business relation of any of the Sellers from maintaining the same business relationships with Buyer after the Closing Date as were maintained with such Seller prior to the Closing Date; or
>
> (c)      solicit or cause or authorize, directly or indirectly, to be solicited for employment for or on behalf of himself or any other person, any person who is an employee of any of the Sellers or had been an employee of any of the Sellers at any time during the two years prior to the Closing Date or during the six months prior to the solicitation.
>
> The Buyer shall be entitled, in addition to any other right or remedy it may have, at law or in equity, to an injunction, without the posting of any bond or other security, enjoining or restraining a Seller from any violation or threatened violation of Sections 5.13 or 5.14.  If any of the restrictions contained in Sections 5.13 or 5.14 shall be deemed to be unenforceable by reason of the extent, duration or geographical scope thereof, or otherwise, then the court making such determination shall have the right to reduce such extent, duration, geographical scope or other provisions hereof and, in its reduced form, such provisions shall then be enforceable in the manner contemplated hereby.  The prevailing party in any action or proceeding to enforce the restrictions set forth herein will be entitled to an award of reasonable attorneys' fees and expenses in connection with such action or proceeding.

(APA), Sec. 5.14.  In addition to the foregoing, each of the Goldmeiers' Employment Agreements (as

hereinafter defined) contained substantially identical non-competition/non-solicitation provisions to those in the APA, but which run for a period of five (5) years "after the expiration of the Term" of the Employment Agreements, *i.e.*, three years from the execution thereof. (Employment Agreements), Sec. 7(b).

        28.    Additionally, and although Worksman was designated as President and Chief Executive Officer of Rand, pursuant to the demands made by the Goldmeiers, the APA specifically incorporated certain protections and controls for the sole benefit of Goldmeiers, including, for example, the following provisions:

> <u>Protective Covenants</u>.  Until all principal, interest, and other amounts due under the Promissory Note have been indefeasibly paid in full, and so long as a Shareholders' Phantom Equity Rights are outstanding or amounts payable with respect thereto remain unpaid, Buyer will comply with  the following requirements, unless the Shareholders shall otherwise consent in writing (capitalized terms used in this Section 5.15 that are not otherwise defined in this Agreement shall be have meanings ascribed to them in the Credit Agreement).  Following payment of the Promissory Note and payment of all amounts outstanding with respect to a Shareholder's Phantom Equity Rights, the consent of such Shareholder shall no longer be required.

>             *  *  *

> <u>Salaries</u>.   Buyer will not pay excessive or unreasonable salaries, bonuses, commissions, consultant fees or other compensation; or increase the salary, bonus, commissions, consultant fees or other compensation of any Director, Officer or consultant, or any member of their families by more than ten percent (10%) in any one year, either individually or for all such persons in the aggregate, or pay any such increase from any source other than profits earned in the year of payment.  Without limiting the foregoing, (a) Buyer will not, directly or indirectly, pay Worksman salary, bonuses, commissions, fees, or other compensation (collectively, "Compensation") which, in the aggregate, (i) exceeds $200,000 in any fiscal year of buyer, or (ii) during the term of each Employment Agreement, exceeds the salary paid to each Shareholder pursuant to such Shareholder's employment Agreement, and (b) Buyer will not, directly or indirectly, pay Worksman any Compensation if and for as long any payment under the Promissory Note is past due (without regard to any cure or grace period including, for avoidance of doubt, the payment extension period provided in Section 1(a)(iii) of the Promissory Note).

> .

(APA), Secs. 5.15 and 5.15(g).

**D.  Continued Ownership Interests Held by the Goldmeiers in New Rand**

29.     As discussed above, as part of the sale of Old Rand, and also on April 23,

2007, each of the Goldmeiers negotiated and executed an *Employment Agreement* with Rand

(together, the "Employment Agreements") (*Exhibits "J"* and *"K"* to the Rand Trial Book).  The

Employment Agreements provided each of the Goldmeiers with, *inter alia*,  the right to receive a

payment from Rand equal to fifteen (15%) percent (a total of 30%) of the "Stated Value" of Rand,

payable upon the occurrence of a "Capital Event" or a "Change in Control", as those terms are

defined in the Employment Agreements. (Employment Agreements), Sec. 6.  The Employment

Agreements define this financial interest as a "Phantom Equity Interest" in Rand.  Exs. J and K

(Employment Agreements, Sec. 6).

30.     Although labeled as "Phantom Equity Interests", it was always understood by

the Goldmeiers that they held actual ownership interests in Rand.  The testimony addressed at the

deposition of Allen Goldmeier makes this clear:

> Q.  …The employment contract that you had executed, and that you have stated is a
> true and correct copy of the original, provides you with the right to received a
> payment from Rand equal to 15 percent of the stated value of Rand, payable upon an
> occurrence of a capital event or upon a change in control, as those terms are defined
> in the employment agreement.
>
> Mr. Kushner: Are you talking about paragraph 6 of Exhibit 12?
> Mr. Pick:  Yes.
>
> Q.  In response to your counsel's comment yes, it is reflected in paragraph 6 and the
> paragraph entitled "Phantom Equity Interest Payment."  What is your understanding
> as to what you are entitled to with respect to this 15 percent interest reflected in
> paragraph 6 of your contract?
> Mr. Kushner:  Objection, you can answer.

A.  I had various rights of compensation and payments, and this refers to one of those compensation understandings that I had a minority share ownership of the company in the amount of 15 percent.

See Transcript of Deposition of Allen Goldmeier at p. 83, Lines 19-25; p. 84, Lines 1-22; p. 87, Lines 21-25; and p. 88, Lines 1-21) (*Exhibit "L"* to the Rand Trial Book).

31.     In August, 2009, and in order to secure a license with Marvel which the Goldmeiers had negotiated, the Goldmeiers agreed to advance certain amounts on Rand's behalf. The loan was memorialized in an Agreement dated August 25, 2009 (*Exhibit "O"* to the Rand Trial Book) that:  *"The Goldmeiers equity in Rand will revise*[12] *from 30% to 40%"* and that Rand must *"begin operating via the Board of Director approach as already agreed in the Buy/Sell."* (emphasis added). The August 25, 2009 Agreement was drafted by Allen Goldmeier and was signed by both Allen and Steven Goldmeier.

32.     To evidence the Goldmeiers' exercise of continuing control over Rand and the management of its operations, the Employment Agreements expressly precluded Rand from making any distributions to the "members" of Rand without first obtaining the permission of the Goldmeiers. J and K (Employment Agreements, Sec. 6(e).

33.     As an additional part of the sale of Old Rand, the Goldmeiers negotiated and executed a *Voting Agreement* (the "Voting Agreement") (*Exhibit "M"* to the Rand Trial Book), which was also dated April 23, 2007, pursuant to which the Goldmeiers were granted, among other things, input into Rand's business decisions, access to all financial information, the right to appoint either Steven Goldmeier or Allen Goldmeier to the Board of Managers and the right to receive all notices of any meeting of the Board.  (Voting Agreement).

---

[12] Meaning "increase" from 30% to 40%

34.     By way of the complaint filed in the subsequent State Court Action (defined below) which was verified by Allen Goldmeier, the Goldmeiers stated as follows:

> The Voting Agreement was intended to ensure that the Goldmeiers would have the opportunity, through their designee to Rand's Board of Managers, to participate in the process of making important and critical decisions concerning Rand's business activities and to have access to financial information concerning Rand and its dealings with Wells Fargo, critical suppliers and other trade creditors, as well as all facets of the ongoing business activities.

See the Verified Complaint filed in the State Court Action at ¶45 (*Exhibit "N"* to the Rand Trial Book).

35.     October 15, 2009, the Goldmeiers were discharged as employees of Rand for cause.  Mr. Stephan Pinsly, Managing Director of Getzler Henrich & Associates, LLC, a turnaround firm retained by Rand at the behest of Wells Fargo Bank, testified in his Trial Affidavit (and admitted into evidence), without contradiction of any kind as follows:

> On October 15, 2009, the Goldmeiers were discharged as employees of Rand, at my request as the Chief Restructuring Officer, for, among other reasons, their continuing disruptive influence on the operations of the company and their refusal to follow instructions.  Based on my personal observations while working in the Rand office and my review of books and records,  as well as pursuant to conversations that I had with the Goldmeiers and Rand employees, it was my considered opinion that:
>
> (i)     But for the Goldmeiers' obstructionism, imprudence and lack of cooperation with Mark Worksman, many of the facts and circumstances relied upon by the Goldmeiers in having commenced the State Court Action and now in filing the Involuntary Petition would never have occurred.  It was the Goldmeiers who had caused and/or exacerbated the very conditions of which they complain, by, among other things, their manipulation of Mark Worksman into numerous untenable positions concerning the growth of the revenues and their not following through on oral promises to subordinate their security interests. By any standard of justice and fairness, they should not be permitted to reap the benefits of their own misconduct by now trying to push Rand into liquidation.
>
> (ii)     Absent the misconduct of the Goldmeiers (including their unreasonable refusal to subordinate their secured debt to a new senior lender, after having agreed to

28

do so), Rand would have been able to function as a profitable business. It had paid down $14.5 million in bank debt to Wells Fargo in less than 3 years. While Rand is today a smaller company than it once was, it is still doing $12 million in sales on an annualized basis, and, in my opinion, can be further restructured to generate a profit and thereby provide the wherewithal to pay any debt alleged to be due to the Goldmeiers and/or Rand's unsecured creditors. It is my opinion that the personal ill will/antagonism that the Goldmeiers have against Mark Worksman was the primary impetus resulting in the filing of the Involuntary Petition.

## E.  The Goldmeiers Start State Court Proceedings Against Rand and Mr. Worksman

36.     Immediately following their termination, and by letter dated October 23, 2009 (the "October 23, 2009 Letter") (*Exhibit "R"* to the Rand Trial Book), the Goldmeiers and Century Sports, by their counsel, advised Rand and Worksman that, among other things, the Goldmeiers had accelerated the maturity of the Subordinated Note and all other amounts allegedly owed to them and demanded payment in full of all such indebtedness. The October 23, 2009 Letter further advised that "[a]s a result of the occurrence of Events of Default….Rand [International Leisure Products Ltd.] hereby elects to exercise all of its rights, powers and remedies under the POA [i.e., power of attorney] and the other Loan Documents by, among other things, *assuming the immediate assumption of its right to manage and operate the Company." (emphasis added)*. Id. In response, Worksman denied that any "Event of Default" had occurred.

37.     After issuance of the October 23, 2007 Letter, the Goldmeiers had multiple unsuccessful meetings with Worksman, as set forth in the Verified Complaint filed in the State Court Action:

> Despite over ten (10) meetings with Worksman, his counsel and the consultant (referring to Stephan Pinsly), Rand has not and will not provide a workable solution to the Goldmeiers...

(Exhibit "N" to the Rand Trial Book) (Verified Complaint at ¶117).

29

38.     Totally unsatisfied in their negotiations with Rand, the Goldmeiers decided to try and ratchet up the pressure on Rand.  Accordingly, on January 19, 2010, counsel to the Goldmeiers gave notice of presentment of an order to show cause for a temporary restraining order (the "Order to Show Cause") and other provisional relief in the New York State Supreme Court located in Mineola.  On January 20, 2010, the Goldmeiers and Century Sports commenced an action against Rand in the Supreme Court of the State of New York, County of Nassau, captioned *Allen Goldmeier, Steven Goldmeier and Century Sports, Inc. f/k/a Rand International Leisure Products, Ltd. v. Mark Worksman and Rand International Leisure Products, LLC f/k/a Rand International Acquisition I, LLC, and Meltzer, Lippe, Goldstein & Breitstone, LLP,* Index No. 1315/2010 (the "State Court Action").  Pursuant to the State Court Action, the Goldmeiers and Century Sports sought, among other relief, a temporary restraining order directing the delivery and turnover to Century Sports of Worksman's alleged 100% membership interest in Rand, an order of seizure of the assets of Rand,[13] money judgments against Rand and an order precluding Rand from taking any steps to assign, sell and/or transfer any of the collateral securing the Subordinated Note held by Century Sports.

39.     In support of a Cross-Motion made by Rand to dismiss the State Court Action as premature under the Subordination Agreement, Mr. Worksman submitted an affidavit, sworn to on  February 1, 2010 (*Exhibit "S"* to the Rand Trial Book), wherein he identified to the State Supreme Court the underlying motive of the Goldmeiers in commencing the State Court Action (and this proceeding):

As shall be further explained in detail below, the present motion for an

---

[13]  This was not being pursued to protect anyone's interests other than the personal interests of Steven and Allen Goldmeier only.

> Order of Seizure and Preliminary Injunction is nothing short of a naked
> and blatantly wrongful power grab on the part of the [Goldmeiers] who
> have apparently concluded that "the best defense is a good offense."

(Affidavit) at ¶2).

40.     In further support of the Cross-Motion, Stephan Pinsly as Managing

Director of Getzler, Henrich & Associates, submitted an affidavit, sworn to on February 1, 2010

(*Exhibit "T"* to the Rand Trial Book), wherein Mr. Pinsly disputed the allegations made by Allen

Goldmeier in the State Court Action and alleged, among other things, that the Goldmeiers were

actively involved in the operation of Rand which included their meeting with customers, suppliers

and employees and that the Goldmeiers were terminated as employees at Mr. Pinsly's request for

cause including their "disruptive influence on the operations" of Rand and that the  Goldmeiers

had created the tenuous situation at Rand by their "continuous manipulation of [Worksman] into

numerous untenable positions regarding the growth of revenues and not following through on oral

promises to subordinate their security interests".

41.     On February 18, 2010, the Honorable Timothy S. Driscoll, of the New

York State Supreme Court, rendered a seventeen (17) page written decision (*Exhibit "U"* to the

Rand Trial Book) and a copy of which is attached as *Exhibit "F"*, which held in pertinent part, as

follows:

> The Court denies Plaintiffs' applications for injunctive relief and orders of
> seizure based, in part, on the Court's conclusion that Plaintiffs have not
> demonstrated a likelihood of success on the merits.  In light of the factual
> disputes regarding numerous issues, including 1) the extent to which the
> Goldmeiers participated in Rand's daily operations, 2) the quality of the
> parties' contributions to Rand's daily operations, 3) the extent to which the
> Goldmeiers and/or Worksman were a causative factor in Rand's difficulties
> in meeting its financial obligations, 4) the viability of Rand in its current
> financial condition, and 5) the appropriateness of Rand's decision to

terminate the Goldmeiers as employees of Rand, the Court determines that Plaintiffs have not demonstrated a likelihood of success on the merits.

Moreover, in light of the factual disputes regarding the current viability of Rand, Plaintiffs have not met their burden of establishing irreparable harm without injunctive relief.  The Court also concludes that Plaintiffs have not demonstrated that their alleged harm is not compensable by money damages.  In addition, Plaintiffs have not offered proof that Wells Fargo consented to this application for an order of seizure, as the Subordination Agreement appears to require.

Finally, the Court also concludes that Plaintiffs have not demonstrated a balancing of the equities in their favor.  The Court has not been presented with sufficient proof that, as Plaintiffs, submit, Rand will (fail) without the requested injunctive relief and the value of their interest in the Collateral will be greatly compromised. Indeed, it could well be that Plaintiffs have overstated their role in Rand's viability.

In light of the foregoing, the Court 1) denies Plaintiffs' application in its entirety and 2) vacates the TRO.

* * *

The Court concludes that the applicable provisions of the Subordination Agreement may preclude the instant action unless and until Wells Fargo has been fully paid under the applicable loan documents.  The Court, however, cannot determine from the record before it whether full payment has been made to Wells Fargo.  Accordingly, the Court denies Defendants' cross motion, with leave to renew upon a showing, based on documentation provided by a representative of Wells Fargo or another source with personal knowledge of the relevant facts, that Wells Fargo has not been fully repaid in connection with the loans at issue.

All matters not decided herein are hereby denied.

This constitutes the decision and order of the Court.

See Ex. T (February 18, 2010 Decision) at pp. 16-17. The Court further directed that all

"parties appear before the Court on March 18, 2010 at 9:30 a.m. for a Preliminary

Conference". Id.

42.     As expressly acknowledged by Allen Goldmeier, the results of Justice

32

Driscoll's decision were utterly disappointing and did not result in the Goldmeiers acquiring the immediate and complete control of Rand as they had envisioned.  Thus, the Goldmeiers and their counsel openly orchestrated an alternative route to take:  "Bankruptcy".

## ARGUMENT

### THIS COURT SHOULD EXERCISE ITS DISCRETION AND GRANT A STAY PENDING APPEAL AS ALL OF THE CRITERIA FOR ISSUING A STAY EXIST

43.     A request for a stay of a bankruptcy court order pending appeal thereof is governed by Bankruptcy Rule 8005 which requires that such a request be presented, in the first instance, to the bankruptcy court.  As discussed above, Rand's motion for such a stay was denied by the Bankruptcy Court by way of the Order.

44.     The following four criteria are relevant in considering whether to issue a stay pending appeal: (1) the likelihood of success on the merits; (2) irreparable injury if a stay is denied; (3) a balancing of hardships weighs in favor of the movant; and (4) the public interest in granting or denying a stay.  See, e.g., Hilton v. Braunskill, 481 U.S. 770, 776 (1987).  The four factors may be balanced so that a strong showing of one will counterbalance a weaker showing of another.  Mohammed v. Reno, 309 F.2d 95, 101 (2d Cir. 2002).  The four factors must not be viewed in a vacuum but rather in "light of the importance of the right to appeal and preservation of the status quo during the appeal."  In re Howley, 38 B.R. 314, 315 (Bankr. D. Minn. 1984).  Turning to the instant case, it is respectfully submitted that each of the four factors weighs in favor of a stay pending the outcome of the Appeal, as well as a temporary restraining order pending the determination of the Motion by this Court.

### F.     There is a High Probability of Success on the Merits of the Appeal

33

45.     Case law analyzing the "likelihood of success" factor of the stay pending appeal analysis have clarified that the requisite showing is not as rigid as once perceived:

> [T]he proper standard governing the strength-of-case component of a motion for a stay pending appeal of a bankruptcy court order is "substantial possibility" of success on the merits - *i.e.*, the same standard utilized on a motion to stay a district court's order pending appeal to the Court of Appeals - rather than the "strong likelihood" of success standard.

In re General Credit Corp., 283 B.R. 658, 660 (S.D.N.Y. 2002), *citing* In re Cretella, 47 B.R. 382, 383 (E.D.N.Y. 1984).  The court's consideration of this factor must also be tempered against the showings made by the proponent of a stay as to the other criteria of the analysis.  Mohammed, 309 F.2d 95 at 101.  As the Second Circuit stated in Mohammed:

> The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other [stay] factors...Applying this test, [the District of Columbia Circuit] has granted a stay pending appeal where the likelihood of success is not high but the balance of hardships favors the applicant...and has stated that a stay may be granted where the probability of success is 'high' and 'some injury' has been shown.

309 F.2d at 101 (internal citations omitted).

**1.     The Bankruptcy Court Disregarded the Substantial Evidence Demonstrating That the Filing of the Involuntary Petition Was a Blatant Attempt to "Forum Shop" a Two-Party Dispute Unsatisfactorily Determined by the State Court**

46.     Rand had contended that the Involuntary Petition commencing this case was filed in bad faith and, thus, should be immediately dismissed.  While there is a presumption of good faith in favor of a petitioning creditor which must be overcome by an alleged debtor, Lubow Machine Co., Inc. v. Bayshore Products Corp., (In re Bayshore Products Corp.), 209 F.3d 100, 105 (2d Cir. 2000) *quoting* (United States Fidelity & Guaranty Co. v. DJF Realty & Suppliers, Inc., 58 B.R. 1008, 1011 (N.D.N.Y. 1986)), Rand had contended that, under any of the three tests enunciated

in <u>Lubow</u>, *supra*, the Involuntary Petition herein was filed in bad faith.  <u>Lubow</u>, the leading decision

in this Circuit stated as follows:

> Some courts have used an "improper use" test which "finds bad faith when a
> petitioning creditor uses involuntary bankruptcy procedures in an attempt to obtain a
> "disproportionate advantage" for itself, rather than to protect against other creditors
> obtaining disproportionate advantages, particularly when the petitioner could have
> advanced its own interests in a different forum. <u>In re K.P. Enter.</u>, 135 B.R. 174, 179
> n. 14 (Bankr. D. ME 1992) see also <u>In re Better Care, Ltd.</u>, 97 B.R. 405, 410-411
> (Bankr. N.D. Ill 1989). Other courts have applied an "improper purpose" test, where
> bad faith exists if the filing of the petition was motivated by ill-will, malice, or a
> desire to embarrass or harass the alleged debtor. See <u>In re Camelot</u>, 25 B.R. 861, 864
> (Bankr. E.D. Tenn. 1982). A third line of cases employs an objective test for bad faith
> based on "what a reasonable person would have believed." <u>Jaffe v. Wavelength, Inc.</u>
> <u>(In re Wavelength, Inc.)</u>, 61 B.R. 614, 620 (9th Cir. BAP 1986) (internal quotation
> marks omitted). Finally, as the Eleventh Circuit has observed, a number of courts
> have sought to model the bad faith inquiry on the standard set forth in Bankruptcy
> Rule 9011. See <u>General Trading Inc. [v. Yale Materials Handling Corp.</u>, 119 F.3d
> [1485] 1501-02 [11th Cir. 1997]; In re Fox Island Square Partnership</u>, 106 B.R. 962,
> 967-68 (Bankr. N.D. Ill. 1989).

        47.     That bankruptcy jurisdiction is not to be sought as a forum for resolution of

two-party disputes is well settled.  *See, e.g.*, <u>In re Trina Assoc.</u> 128 B.R. 858 (Bankr. E.D.N.Y. 1991)

(Court abstained because, *inter alia*, state court action governing identical subject matter was

pending).  This very obvious two-party dispute was at the heart of the decision in <u>In re Mt. Dairies,</u>

<u>Inc.</u>, 372 B.R. 623 (Bankr. S.D.N.Y. 2007), in which the Court stated:

> Finding in [petitioning creditor]'s favor would encourage plaintiffs in two-party
> disputes to flock to bankruptcy court in the hopes of a brisk resolution of those
> disputes. At the very least, it would legitimize the threat of an involuntary petition
> and provide plaintiffs with a powerful advantage. Defendants in two-party disputes
> would be placed at a significant disadvantage if, facing the stigma of bankruptcy,
> they were compelled to settle on unfavorable terms. *See, In re BDC 56 LLC,* 330 F.3d
> 111 at 117-18 ("Congress plainly did not intend to require a debtor to pay a
> legitimately disputed debt simply to avoid the stigma of bankruptcy.") (quoting *In re*
> *Lough,* 57 B.R. 993, 997 (Bankr. E.D.Mich. 1986))   (internal quotation marks
> omitted). This Court is not prepared to endorse a policy that would so disrupt the
> very fabric of our judicial system.

372 B.R. at 634.

48.     Immediately following the issuance of Justice Driscoll's decision on February 18, 2010, the Goldmeiers embarked on a new strategy so as to preclude Justice Driscoll from making any further findings on the merits of the issues relevant to the State Court Action and to remove the contested disputes to this Court. Their intent was not kept secret from anyone.  On February 25, 2010, *and within days of the issuance of the February 18, 2010 decision*, Mr. Worksman was advised by James B. Zane, Esq., Rand's pre-petition state court counsel, that the Goldmeiers' counsel, Gary Kushner, Esq., had openly expressed to Mr. Zane the Goldmeiers' intent and determination to file an involuntary petition against Rand.  Specifically, Mr. Kushner had represented that the Goldmeiers, together with "5 or 6 others," were going to file an involuntary petition in bankruptcy against Rand on or about February 26, 2010.  (See Trial Affidavit of Edward S. Rudofsky at ¶4).

49.     In furtherance of their newest scheme and/or agenda to remove the State Court Action to the bankruptcy court, *the Goldmeiers immediately solicited participation by other petitioning creditors, admitting that their motivation was twofold: (a) their impatience with Judge Driscoll in the State Court Action and (b) a clear intention to wrest control of the business and the Premises from Rand and to get out from under the non-compete covenant they had with Rand*.  Allen Goldmeier's statement made in his deposition (*Exhibit "L"* to the Rand Trial Book*)* is compelling and instructive as to the Goldmeiers' motivation in filing the Involuntary Petition.  The following is a verbatim quotation from his deposition which was entirely disregarded by the Bankruptcy Court:

> Q. … There came a time that you initiated litigation in the state court.  At the time that you initiated that litigation was it your intent to reacquire full control of Rand International

36

Leisure  Products, LLC; was that your intention?

MR. KUSHNER:  Objection, you can answer.

A.    My objective was to protect my interest in the company, namely the debt that was owed to me and my brother.

Q.    What was the debt that was owed to you?

MR. KUSHNER:  When?

MR. PICK:  He said the motivation for the commencement of the state court action was to protect the debt owed to him.

MR. KUSHNER:  Are you asking him what the debt was at the time that the state court action was filed, is that what you're asking?

MR. PICK:  Yes.

Q.    What debt were you trying to protect at the time that the state court action was started?

A.    The rent, the loan, any salaries, any expenses owed to me and bonuses. Any of the many obligations that he owed.

Q.    As part of that action you sought a temporary restraining order and a seizure of the assets; is that not correct?

MR. KUSHNER:  Objection, you can answer.

A.    We sought a restraining order, yes.

Q.    And a seizure of the assets?

A.    I can't remember.

Q.    Did you seek, if you recall, a court order to reacquire full control of Rand International?

A.    I can't remember if it was full control.

Q.    But control?

A.    Some control, yes.

Q.    What do you mean by "some control"?

A.    That for once in my life I would  have a say in the matter.  Whereas Worksman never allowed me to have a true vote at Rand, to have any say in the business decisions of Rand.  It was time for me to have some say in Rand inasmuch as Worksman had put the company into a liquidation.

Q.    On February 18, 2010, the honorable Timothy S. Driscoll issued his decision on a request for an injunction and your request for an order of seizure, and he scheduled a further appearance by all parties on March 18, 2010.  Do you recall when was the first time you saw a copy of that decision?

A.    If he rendered that decision on the 18th it would have been soon after.

Q.    A day or two after, if you recall?

A.    I can't recall.  I presume within a week.

**Q.    How soon after you were in possession of that decision did you decide to file an involuntary position with the United States Bankruptcy Court for the Eastern District of New York?**

**A.    Immediately after, within the next couple of days.**

**Q.    Did you discuss this with Steven Goldmeier?**

**A.    Yes.**

**Q.    And Steven Goldmeier joined you in deciding that this was an option you should**

pursue against the company?

**A.    Yes.**

**Q.    What were your reasons for filing the Chapter 11 petition?**

**MR. KUSHNER:  Objection, you can answer.**

**A.    Because the judge ordered us back to settlement discussions.  I'm not aware if the judge realized that I had three-and-a-half months of prior settlement discussions, which just wasted three-and-a-half months of my time, and concluded with the revelation that Worksman didn't want to settle with us anywhere near something that we thought was fair.**

Q.    When did Judge Driscoll order you back to settlement discussions?

A.    I recollect that he mentioned a date that he wanted us to discuss a settlement.

Q.    Was that immediately after his determination on February 18th or before his determination on February 18, 2010?

MR. KUSHNER:  Objection, you can answer.

A.    What I recall is the settlement discussion date was a few weeks after.

Q.    When did Judge Driscoll order you back to settlement discussions?

A.    At a date after he rendered his decision.

Q.    Are there any other reasons that you have for the filing of the Chapter 11 petition (sic), other than Judge Driscoll ordered you back to settlement discussions?

MR. KUSHNER:  And other than seeking to protect his investments, his assets, things like that.

MR. PICK:  That wasn't his testimony; that is your testimony, Mr. Kushner.

MR. KUSHNER:  That's what I think he said.

MR. PICK:  I'm asking him for his testimony.  Please, I would appreciate –

MR. KUSHNER:  If you're going to include "other" then you should include the comprehensive list of things that he testified to.

MR. PICK:  You're testifying for the witness, Mr. Kushner.

**Q.    I'll ask you again.  What other reasons did you have for the filing of the Chapter 11 petition immediately following Judge Driscoll's decision on February 18, 2010?**

A.    The answer is obvious, to protect whatever remaining assets was left at Rand that was at the time solely under Worksman's control, and the assets were being diluted each and every day, and continue to be diluted*; we just felt that it's time to go to the bankruptcy court.  And if he's not going to pay me rent, then we're going to have to get a ruling on his operating from my property and put an end to this never-ending discussion of settling that was going nowhere.  He didn't really want to settling by offering us anything that was fair.*

Q.    Were there any other reasons other than to protect your assets, which we just heard from your counsel?

MR. KUSHNER:  And himself.

Q.    And your dissatisfaction with the fact that Judge Driscoll ordered you back to settle the discussions?

A.    Worksman was in default of all his obligations to us.  He wasn't honoring the employment contract, he wasn't honoring the  payments.  He kept telling me that we can't compete with him*.  I'm saying that you defaulted on all the contracts that we had with you*

38

*from A to Z, and meanwhile you're telling me that we're compelled to certain aspects of the agreement. So we decided to let the bankruptcy court rule on this situation.*

**Q.     Just to be complete.  Are there any other reasons you had for the filing of the Chapter 11 petition, other than what you just testified to?**

A.     To ***get justice as far as all obligations that he owes to us, encompassing everything.***

Q.     Okay.  I just want to know all your reasons, and that encapsulates all your reasons?

A.     Yes.

Q.     Okay.

**A.     There's another reason, I wanted to move on with my life.**

Q.     What does that mean?

**A.     If I'm going to dispute this business deal that we had with Worksman for weeks and months ongoing I said it's going nowhere, so let's just end the dispute and get a ruling from a court.  The ruling that we had from Judge Driscoll was to continue settlement discussions and Worksman didn't want to settle. So continuing to talk another round of weeks, possibly months, and just being dragged through the mud further, we figured let's just go to a more expedient avenue to resolve these disputes and that was the bankruptcy court.**

Q.     *Was that your decision to go to bankruptcy court?*

**A.     It was the decision of my brother and myself.  Then I asked Gary (referring to Gary Kushner) for his thoughts.**

*Q.     And the determination was then made to file the petition?*

**A.     Yes.**

*Q.     What thoughts did your brother Steven have that were stated to you with respect to the filing of the involuntary petition?*

**A.     His thoughts paralleled the thoughts I just stated.**

**Q.     They were exactly the same, there were no other reasons given?**

**A.     I told you it's to encompass –**

**Q.     You don't have to repeat what you said.  I'm just trying to make sure it's all consistent?**

**A.     I told you to encompass a finalization of the entire dispute.  Not limited to anything in particular, just to end the dispute and move on with our lives.  So Steven agreed that to get out of a disputed matter that was lingering for months we felt that Mr. Driscoll, he didn't understand, or I should say Judge Driscoll didn't understand that we've already been discussing a settlement for months and months and it was going nowhere. So rather than just continue through an endless discussion that was not going to get resolved, we figured let's just go to the bankruptcy court and we'll get a faster decision.**

**Q.     The disputes that you wanted a faster decision related to the disputes before Judge Driscoll and in a landlord/tenant court, or just before Judge Driscoll?**

**A.     We went to the bankruptcy court to get a disposition on all disputes.**

**Q.     So the disputes that you're referring to are the disputes that were before Judge Driscoll in the state court action, and the disputes that were pending in the landlord/tenant court?**

MR. KUSHNER:  Objection.  Just for the record –

MR. PICK:  Let me finish the sentence.

MR. KUSHNER:  Doug, you're giving him wrong information.  The landlord/tenant proceeding was filed a day after the bankruptcy court, so you're asking him an improper question.

Q.    You signed the notice of petition on March 3 but it was filed the day after.  Wasn't there a prior pending action filed in Nassau County that was dismissed prior to the filing of the involuntary petition?

A.    I think we withdrew that because we filed in Nassau, and then we discovered it should be filed in Suffolk.

Q.    Right.  So there was a prior pending dispute in the landlord/tenant court, it was filed in the wrong court.

MR. KUSHNER:  The landlord/tenant court you're referring to is in the exhibit that was memorialized by the landlord/tenant petition.

MR. PICK:  That's the same dispute, but I don't mind.

Q*.    What you're testifying today is that basically you were trying to resolve all the disputes in the bankruptcy court that was pending in the state court before Judge Driscoll?*

A.    *Whatever they were, all of the disputes.  I'm sure the bankruptcy judge is going to rule on the entire issue.*

See Exhibit "L" to the Rand Trial Book (Goldmeier Tr. at pp.  177, line 8 through 188, line 3) (emphasis added).

50.    Needing more Petitioning Creditors to sign an Involuntary Petition, the Goldmeiers embarked on mass telephone calling and/or mass e-mailing each of Rand's creditors, soliciting each as described below, by a combination of providing misleading and/or misstated facts, making false promises and/or by failing to reveal the actual self-serving reasons for the solicitation of potential petitioning creditors.  In order to induce creditors to sign, the creditors were advised that they need not engage their own counsel.  By way of example only, on May 3, 2010, Ellen Liu, General Manger of Sales Chief, raised a concern to Allen Goldmeier over incurring legal fees:

Meanwhile, I would like to clarify with you on the attorney fee for this case, please advise who will be responsible for this cost?  As you know that we have been damaged with big amount of money owed by Rand, and even we can win the case and get Rand to go bankrupt, we don't expect that Rand will have money left to pay all the creditors, therefore, *I did not plan to spend the cost.  I did not ask you this question when I agreed to sign the petition, but I think we should clarify this point by now before further going on this case. Please Confirm*

On May 6, 2010, Allen Goldmeier responded as follows:

From:  allengoldmeier@aol.com
Sent:  Thursday, May 06, 2010 2:48 AM
To:  tpe-ellen@saleschief.com.tw
Cc:  allengoldmeier@aol.com
Subject: Re: Rand

Dear Ellen
*My attorney has advised that Sales Chief does not have to hire their own attorney, although we still request that you cooperate ongoing as a petitioner.* My attorney will be involved at all times during your cooperation and I have to pay my attorney, you don't.  This means I'm not paying your legal bill; I'm paying my legal bill which includes the timeframe spent on your cooperation.
[Ellen Liu] Thanks for your confirmation, noted.

For your cooperation, we will need you to be available for a video telephone conference to do the deposition and to also be available via video telephone conference during the trial dates, June 16 and possibly June 18.  *By the way, during deposition my attorney will instruct you what to answer and what not to answer.  So its only a matter of providing honest answers to the questions pertaining to the payment issues.*  (emphasis added)


-and-

From:  allengoldmeier@aol.com
Sent:  Wednesday, March 03, 2010 4:23 PM
To:  Matang Gonzales
Cc:  Steven Goldmeier
Subject:  From Mat Gonzales

Hi Mat,
We believe a counter action for trying to get payment satisfaction is highly unlikely.  We already have a sufficient # of creditors signed up.  *By you signing the petition I am covering your claim under the cost of my attorney, and also covering if they contest it.*
There's many dozens of creditors, and the strength behind these several claimants make us believe they couldn't possibly counter per your concern.
Once again pls check with your attny.  To help you decide if you would like to sign back and *join in under my umbrella,* or if its best you continue your independent claim?
Mat, I am very, very sorry you became stuck in this.  I could never imagined that Rand would end up in this situation.
Allen
Sent via BlackBerry byAT&T (emphasis added)

-and-

From:  allengoldmeier@aol.com [mailto:allengoldmeier@aol.com]
Sent:  Thursday, April 29, 2010 6:55 PM
To:  Earl Spencer
Cc:  Chandler Armistead[14]
Subject:  response

*As far as your bankruptcy petition; you do not need to hire your own attorney for the deposition process.  Actually my attorney will oversee the process of your deposition.*  In preparation of this, hopefully you can document that Rand owes you every penny of the petitioned debt.  Anything you have on file relative to proving the amount is due would be helpful because Worksman is going to lie and dispute the obligation and make a case that your trying to cheat him.  You also may want to jot some notes recalling prior conversations you've had with him, and anything that is relative to demonstrate his lack of integrity and/or managerial ability.

Additionally, the various problems he's had with the owners of magnolia and KW, and the problems you've had it trying to maintain their support of Rand.  It all relates to why he is now in a bankruptcy proceeding, presently trying to cheat the creditors.

That's it for now.  Justice will prevail!  If not we'll call Mark Dauler.

Allen

-and-

From: <allengoldmeier@aol.com>
Sent:  Monday, March 08, 2010 7:14 AM
To:  "Ellen Liu" <tpe-ellen@saleschief.com.tw>
Cc:  "Paul Su" <tpe-paul@salschief.com.tw>
Subject:  "Rand

Hi Ellen,
Looks like tmmrw my lawyer will proceed filing the bankruptcy petition as Worksman has offered nothing to settle other than threatening the Goldmeiers with lawsuits.
[Ellen Liu] Noted.

54.     Amazingly, the making of these promises was denied by Allen Goldmeier

in his deposition.  Such perjuring testimony was also ignored by the Bankruptcy Court.  By way of

example when asked about his representations made to Mr. Gonzales, Mr. Goldmeier testified as

42

follows:

> Q.  On the bottom of the page it says, "Hi Allen, I spoke with Brian Hufnagel and he said I should ask you if you are going to 'cover me' if a legal action backfires and Rand comes after me for damages. Will you do this for me?  Matt."  Do you understand what he was asking you?
> A.  Yes.
> Q.  What was he asking you?
> A.  If he gets counter-sued will I cover him, meaning I guess his costs.
> Q.  Did you promise to cover his costs?
> A.  No, I did not.
> Q.  Did you promise to cover his legal fees?
> A.  No
> Q.  Did you promise any of the petitioning creditors to cover their legal fees?
> A.  No.  I pay my own legal fees.
> Q.  Did you make any promises to any of the petitioning creditors when you solicited them to sign the involuntary petition?
> Mr. Kushner:  Objection, you can answer
> A.  No, I did not.

Goldmeier TR. Page 226 (commencing with line 13) and 227 (ending with line 12).

51.    Amazingly, the Bankruptcy Court seemingly ignored the foregoing and erroneously concluded that this was not a two-party dispute based solely upon the fact that the Goldmeiers were able to locate creditors of Rand to join it in its efforts to liquidate Rand.

**2.    The Bankruptcy Court Totally Disregarded the Goldmeiers'
Singular Efforts at Soliciting All of The Petitioning Creditors**

52.    The type of aggressive solicitation engaged in by the Goldmeiers was addressed in the case of U.S.F& G v. Fasano (In re Fasano), 58 B.R. 1008 (N.D.N.Y 1985), which contains a detailed analysis of the law on solicitation of creditors for an involuntary petition.   The Court, while reversing a lower court decision dismissing a petition on the grounds of bad faith, set out standards for bad faith solicitation stating that: "Bad faith on the part of a petitioning creditor in

---

[14]  Chandler Armistead is an officer with Bargain Furniture, Inc., another Petitioning Creditor.

an involuntary bankruptcy proceeding will not be found unless there is proof that a petitioning creditor's solicitations were composed of false statements or the solicitation itself amounted to fraud." 58 B.R. at 1012.  In this case, we have written solicitations by Allen Goldmeier to creditors that are demonstrably false, *i.e.*, (a) his commitment to cover legal fees; (b) a promise to indemnify against damage claims; (c) instructions to petitioning creditors to change the amounts on their "amended" petition, so as to reduce the possibility of a challenge based upon a *bona fide* dispute; and  (d) a transparent attempt to divert Rand's business opportunities to himself in violation of his "non-compete" covenants with Rand.  In his deposition, however, Allen Goldmeier denied having made any of these promises.  Was Allen Goldmeier making false statements in his representations to petitioning creditors, or in his deposition under oath?  Rand contends that, either way, the solicitation amounts to bad faith.  In fact, the <u>Fasano</u> Court's analysis of case law is instructive on this point:

> An objective standard considers whether a reasonable person in the position of the petitioning creditor would have initiated the bankruptcy proceeding. *In re Grecian Heights Owners' Association,* 27 B.R. 172, 173 (Bankrtcy. D. Oregon 1982). (The only reported court decision using solely the objective standard in determining bad faith.) A subjective standard considers the petitioning creditor's motivation for filing the petition. *Basin Elec. Power Co-op v. Midwest Processing Co.,* 47 B.R. 903, 909 (D.N.D. 1984), *cert. denied* 474 U.S. 1083, 106 S. Ct. 854, 88 L. Ed. 2d 894 (January 21, 1986). In *Basin, supra,* the district court held that in deciding the issue of bad faith, the bankruptcy court should have considered petitioner's subjective motivations *and* its conduct. *Id.* The court reasoned:

> "Considering subjective motivations of petitioning creditors is analogous to considering possible ulterior motives of petitioning debtors in voluntary bankruptcy proceedings. It has long been recognized that using the Bankruptcy process to promote individual interests in a manner not consistent with the legislative purpose of the bankruptcy code is an abuse of the jurisdiction of the bankruptcy courts." (citations omitted.)

> This court agrees that the better practice is for bankruptcy courts to inquire into *both* the creditor's conduct, as well as into its motives for filing the petition. By so doing, bankruptcy courts will be able to insure that the legislative intent of the Code is

44

carried out. Specifically, that petitioning creditors are not abusing the bankruptcy court's jurisdiction.

58 B.R. at 1011.

      53.    When questioned about his contacts and discussions with the Petitioning

Creditors, Allen Goldmeier testified as follows:

    Q.  When you had a discussion with your brother, Steven Goldmeier, and you decided that you were going to be filing an involuntary petition with the bankruptcy court; did you then have any discussions with any of the petitioning creditors that are listed in the involuntary petition?

    A.  At that time?

    Q.  At that time.

    A.  No, we didn't weigh in to any petitioners what we should do.  **We decided at that time, just Steven and myself, and then we spoke to counsel to let's get a quicker end to this dispute and go to bankruptcy court.**

    Q.  When was the first time that you reached out to a creditor to join you in the signing of an involuntary petition?

    A.  I don't know if it was within the first week or the second week of that decision, or the third week.

    **Q.  Was there anyone else reaching out to creditors to sign an involuntary petition, other than you and your brother Steven?**

    **A.  Not that I'm aware of.**  I was under the impression that we needed a couple of creditors and a lot of the people who were owed money from Rand kept asking me is Rand going to pay us and I kept telling them I don't know.  I don't know if I'm going to get paid either.  Worksman is controlling the checkbook and the finances, as he always did. I said I really can't help you to get paid.  We've decided to become petitioners and you're welcome to become petitioners also. That's your own business decision, that's not mine. I make my own business decisions.

    MR. KUSHNER:  I just got an e-mail from Brian Hufnagel under my proposed order, I don't know if it's going to be signed, the amended discovery schedule.  I put in that we would advise you of proposed deposition dates. Brian advises me that Joseph Sandbrook could be available the 24th

    MR. PICK:  Can we do it afterwards …[15]

(Goldmeier Tr.) at pp. 188, line 5 through 190, line 22. (emphasis added).

      54.    Amazingly, the Bankruptcy Court ignored the foregoing and erroneously

---

[15] The deposition taken of Allen Goldmeier was constantly interrupted throughout by messages received on counsel's cell phone, emergency breaks, trips to the bathroom, self-serving statements from counsel, etc.  Although the

declined to dismiss the Involuntary Petition.

### 3. None of the Petitioning Creditors Conducted Any Due Diligence. They Only Signed Their Names Because the Goldmeiers Told Them To

55. When questioned about the benefits, if any, that might be gained by Rand's general unsecured claimants from the filing of an involuntary petition, *Allen Goldmeier had testified that he had no "great expectations of distributions in this bankruptcy case".* (Goldmeier Tr. at p. 223, lines 9-19).

56. Each petitioning creditor who affixes a signature to an involuntary petition avers, under penalty of Bankruptcy Rule 9011, that, among other things, "the debtor is generally not paying such debtor's debts as they become due unless such debts are the subject of a bona fide dispute as to liability or amount." *See* Bankruptcy Code § 303(h)(1). In this case, there is no evidence that such a conclusion was reached by any of the non-insider petitioning creditors; indeed, the evidence and testimony put forth by Rand demonstrated exactly the opposite. In In re Morris, 115 B.R. 752 (Bankr. E.D.N.Y. 1990), the court, in vacating an order for relief, stated that:

> a creditor who files an involuntary petition has an affirmative duty to reasonably investigate the totality of the circumstances surrounding a debtor's finances. The creditor must ascertain how many other creditors exist. It must also determine whether the filing of a bankruptcy petition would indeed help the creditor to collect its debt and prevent the diminution of the estate through the attachment of the debtor's assets by third parties, thereby complying with the purposes underlying section 303 of the Bankruptcy Code. In the instant case, it is doubtful whether any such analysis was made.

115 B.R. at 757. In In re Rush, 10 B.R. 526 (Bankr. N.D. Ala. 1981), moreover, the Court determined that the bad faith of a single petitioning creditor was sufficient to "infect" an involuntary petition such that it was to be dismissed even after the proper joinder of other petitioning creditors

---

deposition was in evidence the Bankruptcy Court ignored all such conduct during the deposition.

under Bankruptcy Code § 303(c).  The Court stated:

> It appears to the bankruptcy judge that it would be against public policy for the Court to entertain any case commenced upon a petition which constituted the practice of a fraud upon the Court and the debtor by a petitioning creditor or creditors.  The dismissal of the petition and the case should be a principle and obvious discouragement for the filing of a petition based upon fraud or other bad faith on the part of the petitioner or petitioners.  Such practice should not be encouraged by allowing the petition and case to continue in court in the event that a creditor or sufficient other creditors not infected with the fraud or other bad faith join in the petition.  The opposite rule would strengthen the hand of a fraudulent petitioner seeking extortion from the debtor as the price for a voluntary dismissal of the petition, because the debtor would be faced with the prospect of having the fraudulent case continue even if the debtor established that the case had been filed in bad faith; thus, the filing of fraudulent petitions would be encouraged.

Id. at 527, n. 1.

57.    The  testimony  at  trial[16]  and  as  further  evidenced  by  the  four  signed Stipulations withdrawing their names from the Involuntary Petition, it was shown to the Court that based solely on the representations and promises made by the Goldmeiers, none of the Petitioning Creditors had conducted any independent verification whatsoever as to the truth of any of the allegations set forth in the Involuntary Petition and/or the Amended Involuntary Petition and none sought benefit of independent legal advice (e.g. none of the Petitioning Creditors' retained counsel except for the Petitioning Creditors who withdrew their names).   In essence then, the Petitioning Creditors, to the extent of their actual execution of the Involuntary Petition and/or the Amended Petition under the standards of Bankruptcy Rule 9011, conducted absolutely no due diligence whatsoever.  Contrary to the Bankruptcy Court's decision, it is submitted that the Goldmeiers' contact with the Petitioning Creditors constituted a clearly impermissible solicitation technique, and rose to the level of bad faith, both on the part of the Goldmeiers and the petitioners so

---

16  Joseph Sandbrook  and Ellen Liu  each testified that they believed that by signing the  Involuntary Petition they

47

solicited.  This is readily apparent in that four (4) of the original Petitioning Creditors, having

subsequently consulted with their own counsel, quickly moved to withdraw their names from the

Involuntary Petition and a fifth Petitioning Creditor refused to participate at trial.

58.    In fact, on March 1, 2010, in an e-mail from Allen Goldmeier to Ellen Liu,

Mr. Goldmeier had made it explicitly clear that his motive in soliciting petitioning creditors:  *"To*

*push him into bankruptcy we need other creditors other than the Goldmeiers to sign the petition to*

*make it a less contestable process"*:

> From:  allengoldmeier@aol.com
> Sent:   Monday, March 01, 2010 5:18 PM
> To:      Ellen Liu
> Cc:      Steven Goldmeier
> Subject:       Rand
>
> Hi Ellen
> As secured note holders of Rand out attorney has made claims with the judge to allow the
> Goldmeiers to take control of the company.  The motion was opposed by Worksmans opposition so
> in the end rather than the Judge rule per the obvious contract defaults we are holding, the Judge
> ordered a further settlement conference a few weeks from now.  We look at this as a setback as the
> time delay allows Worksman to continue the dilution of Rand's depleted assets, delays the eviction
> of him from the building, he keeps pulling a salary and the Goldmeiers remain sidelined not
> working.  *The Answer is to now move it to bankruptcy court; different Judge and put it into*
> *Bankruptcy.*  This is what we would eventually had to do even if we did get control back, but now
> we have no choice to go this route at once even if its still under Worksmans control.  *The situation*
> *is inevitable as there is no way Worksman is going to refinance the company as the Goldmeiers*
> *have the first position and since he's not going to pay us we're not going to subordinate the first*
> *position of our note to allow a refinance.*  Rand has so much debt, I don't think he will refinance
> anyway.  The present business is minimal, and its only a matter of time.
> *To push him into a bankruptcy we need other creditors other than the Goldmeiers to sign*
> *the petition to make it a less contestable process.*  My attorney well knows of your company as
> he's friends with the NY attorney that you were using a few months ago.  My attorney is waiting to
> hear from yours if you will agree to sign the bankruptcy petition to move this along.
> Now here's what you need to think about.
> 1.  Is there any further legal cost to you if you do?  I don't think so.  We just need your
> signature and the updated amount that Rand presently owes you.
> 2.  How does that affect your Winston program?  It doesn't and we realize this bz is

could force Rand to pay them.

valuable to both you and VKS, as Winston is presently nominated by Walmart and we respect not to jeopardize that for Sales Chief.

3.  If Rand goes B, do you get any money back on the prior debt from Rands liquidation. *The answer is Worksman has already depleted most of the remaining assets so the unsecured creditors will not recover.*  The secured creditor, us, may not get anything either?

*4.  How does Sales Chief get old money back???  We have to sit down with you and start a new business.  A business where we are in a partnership.  We buy from you and you make your standard fob commission and become a partner in the domestic profit of the new business.  You own the inventory, the receivables.  The A/R could pay to your USA bank.  New low overhead approach.*

5.  What is the new business.  We have a plan to make it respectable and profitable and we have a valuable new patent to talk to you about and other projects.

6.  Target Store; we would have to go there with you and keep you as the same vendor as prior; just new banking info.

7.  Walmart:  we have a plan to address these politics and take back a share of the business as of January 2011.  This does not mean you give up Winston; *it only means that if some of the business sings back to a new company that we are partners with you, you then get paid back on the prior from the profit split.*

8.  Also we can develop some fob business to ship this year.  Can set up where the LC opens to you in China via new Co.  Name.  Use this also for Target import orders.

*9.  New license opportunity to talk to you at once.*

Need to talk to your level of interest in this concept.  Also I will send you the attorneys name in an email to follow regarding the signing of bankruptcy.

(see *Exhibit "W"* to the Rand Trial Book which also contains a series of e-mail communications between the parties) (emphasis added).

59.    In sum and substance, the filing of the Involuntary Petition was admittedly a litigation strategy employed by the Goldmeiers (and their counsel) when they lost patience with the pace of the State Court Action and Justice Driscoll's alleged mandate that the parties return to settlement discussion.

60.    Indeed, it was only after Justice Driscoll rendered his decision that the Goldmeiers realized (presumably upon advice of counsel), that the Goldmeiers needed to round up some additional creditors to enlist the jurisdiction of this Court for their own personal gain so as to make the filing a "less contestable process".  Mr. Goldmeier testified as follows:

49

Q.     When you had a discussion with your brother, Steven Goldmeier, and you decided you were going to be filing a petition with the bankruptcy court; did you then have any discussions with any of the petitioning creditors that are listed in the involuntary petition?

A.     At that time?

Q.     At that time.

A.     No, we didn't weigh in to any petitioners what we should do.  We decided at that time, just Steven and myself, and then we spoke to counsel to (sic) *let's get a quicker end to this dispute and go to the bankruptcy court.*

(Goldmeier Tr.) at. p. 188, lines 5-18 (emphasis added).  Again, the Bankruptcy Court inexplicably didn't address the Goldmeier's confession in moving their state court action to the Bankruptcy Court.

61.     When the Goldmeiers began to solicit creditors to join them in filing the Involuntary Petition, they made promises and representations which were entirely improper.  For example, there are a number of e-mails (*Exhibits "X"-"Z"* to the Rand Trial Book) which demonstrate clearly that the Goldmeiers invited creditors to join in the petition under their "umbrella," and that they would not incur legal fees for their own counsel (either in joining the petition, or even in defending against an action for damages, should such action ensue after dismissal).  Moreover, it readily appears from these communications that the Goldmeiers made statements to creditors promising to cover their legal fees and, therefore, they need not conduct their own due diligence prior to signing a petition under penalty of perjury.  *In fact, the Goldmeiers went so far as to correct and encourage creditors to change the amounts they believed they were owed in the Amended Involuntary Petition, so as to bring them in line with Rand's books and records, for the purpose of eliminating any defense that such claims were "subject to bona fide dispute.*  By way of example, *Exhibit "X"* to the Rand Trial Book is a copy of an e-mail sent by Allen Goldmeier to George Gross of G Squared on May 13, 2010 which provides as follows:

George, we have an accounts payable document dated Feb 5th that the court required Rand to submit and it shows Rand owes G. Squared $38,331.21.

50

This would be the 2009 shipments to Dollar Tree that appears they never sent you the royalty report.

That's a Worksman trick often cheating.

This is a second default of your lic[ense] contract failing to report.

Pls sign back the amended petition at once at tmmrw morning is the deadline to send in.

Rgds, Allen

62.     *Exhibit "Y"* to the Rand Trial Book are copies of two e-mails composed by

Allen Goldmeier that were provided by counsel to Petitioning Creditor Matang Gonzales:

> From:   allengoldmeier@aol.com
> Sent:   Wednesday, March 03, 2010 2:22 PM
> To:     Matang Gonzales; Brian Hufnagel
> Cc:     Steven Goldmeier
> Subject: Re: Rand
>
> Matt:  Rand has a couple of million in unpaid, unsecured debt obligations to contend with.  Additionally Rand has significant secured payment obligations that are not being honored as well.  By signing the petition your creditors rights will be accelerated although in honesty the opportunity of recovery is minuscule.  Be sure to discuss this with your attorney before signing.
>
> Also, if you would like my attorney to call you to explain, or to speak to your attny, please advise.
>
> Brian; please send Matt the petition for signing in the meantime per info below.
>
> Allen Goldmeier
>                         *   *   *
>
> From:  Matang Gonzales
> To:     Allen Goldmeier
> Cc:     Steven Goldmeier
> Subject:  From Mat Gonzales
> Sent:   Mar 3, 2010 3:21 PM

> Hi Allen,
> I spoke with Brian Hufnagel and he said I should ask if you are going to "cover me" if the legal action backfires and Rand comes after me for damages.
>
> Will you do this for me?
>
> Mat

The "significant secured payment obligations" mentioned in Allen Goldmeier's e-mail above refers to the $3,000,000 Subordinated Note in favor of Century Sports/the Goldmeiers. Again, the Bankruptcy Court, over and over again, simply shut its eyes to all of the communications being generated to and from the Goldmeiers including promises to pay legal fees in their efforts to move the State Court proceedings into Bankruptcy Court.

63.     Similarly, *Exhibit "Z"* to the Rand Trial Book is a copy of an e-mail sent by Allen Goldmeier to Tim Bellows (a potential petitioning creditor) on May 13, 2010 which reads:

> Hi Tim,
>
> Below is the petition that was previously sent to you on April 19th.
> I guarantee that I will take full responsibility in defending any potential counter suit brought upon you.
> I would appreciate that you provide your final decision before days end as far as signing on as a petitioner.
> There is no way possible that I see Worksman can dispute your payment claims.
>
> Thanks,
> Allen

Tim Bellows ultimately refused to participate in this proceeding.

66.     The Bankruptcy Court is no place to resolve a "grudge match." Yet this is precisely the purpose for which the Goldmeiers had improperly invoked this Court's jurisdiction. Rand submits that the Goldmeiers' personal dislike of Mr. Worksman was an essential motivation in

their decision to promote the filing of the Involuntary Petition.  This, without more, has been held to serve as "bad faith" for purposes of dismissing an involuntary petition and assessing damages under Bankruptcy Code § 303(i), and has been described, in one line of cases as an "improper purpose test."  *See, e.g.*, Advance Press & Litho, Inc. 46 B.R. 700 (Bankr. D. Col. 1984); *accord*, In re Fasano, 58 B.R. 1008 (N.D.N.Y. 1986); *see also*, In re Camelot, Inc., 25 B.R. 861, 864 (Bankr. E.D. Tenn. 1982); In re Johnston Hawks, Ltd.,  72 B.R. 361, 366 (Bankr. D. Hawaii 1987); In re Wavelength, Inc., 61 B.R. 614, 620 (9th Cir. BAP 1986).

64.    In In re John Richards Homes Bldg. Co., L.L.C., 291 B.R. 727 (Bankr. E.D. MI 2003), the Court found that an involuntary filing, together with the spreading of malicious information in the creditor community by a petitioning creditor, designed primarily to destroy the debtor's business, constituted "an extreme case of abuse of the bankruptcy process."  Id. at 739. As is clear from the record, the Goldmeiers' malice and bitterness toward Mark Worksman and his management of Rand is palpable.

65.    The foregoing evidence of the bad faith inherent in this filing should have resulted in the dismissal of the Involuntary Petition.

### 4.    The Involuntary Petition Was Unauthorized in That the Goldmeiers Failed to Seek Corporate Authorization in Furtherance of Their Fiduciary Duties to Rand

66.    The Bankruptcy Court found no issue with the Goldmeiers initiating the bankruptcy process without first addressing the issue with Rand's Board of Managers.  The Bankruptcy Court was wrong.  It is well settled that the decision concerning the filing of a bankruptcy petition on behalf of a corporate entity is left to the management of said entity.  As the Honorable Sidney H. Stein, U.S. District Judge held in In re Source Enterprise, Inc., 392 B.R. 541

(S.D.N.Y. 2008):

> [T]he initiation of the [bankruptcy] proceedings, like the run of the corporate activities, is left to the corporation itself, ie. to those who have the power of management." *Price v. Gurney*, 324 U.S. 100, 104, 65 S.Ct. 513, 89 L. Ed. 776 (1945).  State law governs who has the "power of management."  In re Stavola/Manson Elec. Co., 94 B.R. 21, 24, (Bankr. D. Conn. 1988); see  also In re Am. Globus Corp., 195 B.R. 263, 265 (Bankr. S.D.N.Y. 1996).  Under New York law, it is the board of directors that has that authority, see In re Jefferson Casket Co., 182 F. 689 (N.D.N.Y. 1910), assuming the bylaws are not in contradiction, see Am. Globus, 195 B.R. at 265; see also Adorn Glass & Venetion Blind Corp. v. Herbst (In re Adorn Glass & Venetion Blind Corp.), 2004 Bankr. LEXIS 2411, at *13-14 (Bankr. S.D.N.Y. 2004).

Id. at 554.  It is well established that the filing of a bankruptcy petition is a "special act requiring special authorization and not a general duty of an officer."  In re Al-Wyn Food Dist., 8 B.R. 42, 43 (Bankr. M.D. Fla 1980); Regal Cleaners & Dyers, Inc. v. Merlis, 274 F. 915, 916 (2nd Cir. 1921) *(citing* In re Jefferson Casket Company, 182 F. 689 (N.D.N.Y. 1910); 6 *Collier's* (14th ed.) 792)).  In keeping with the same, the Courts of the Second Circuit have held that "[t]here is no presumption of authority in an officer to make and file a voluntary petition in bankruptcy, and he may not do so without the consent of the directors."  Regal Cleaners, 274 F. at 916 (*citing* Jefferson Casket, 182 F. at 692 (N.D.N.Y. 1910) ("It is clear that special authority of the board of directors of a New York corporation is essential to confer authority upon its president to execute and file a petition on its behalf in voluntary bankruptcy...").  "It is well established that the president of a corporation has no general power to file a petition because such an act goes beyond the daily management of corporate affairs; it is a specific act requiring specific authorization." Stavola/Manson Electric Co., 94 B.R. at 24.

      67.     As discussed at length above: (i) Rand was operated under the direction of its

President and Chief Executive Officer , its two Executive Vice-Presidents and its Board of Managers which consisted of Mr. Worksman and Allen Goldmeier and (ii) The Goldmeiers had an equity ownership interest in Rand.  Rand had always complied with the corresponding corporate formalities and had always included the Goldmeiers in major business decisions. Also, although the Goldmeiers' employment with Rand was terminated for cause on October 15, 2009, Allen Goldmeier continued to sit on Rand's Board.   As such, the Goldmeiers are "insiders" of the Debtor who improperly orchestrated the filing of the Involuntary Petition in order to circumvent the requisite approval of Rand's Board.  As a result, the entire Involuntary Petition, having been tainted with the Goldmeiers' impropriety, should have been dismissed.  At no time did Allen (or Steven) Goldmeier call a special meeting of the Board to discuss authorization to file an involuntary petition or call a meeting with me to discuss bankruptcy as an option for any reason.  The Goldmeiers always had one goal which was to seize the corporate assets, acquire the operations of Rand and to terminate their non-compete restrictive covenant.  They had believed that bankruptcy would help them achieve all of their self serving desires.

**5.    The Claims of the Six Petitioning Creditors recited in the August 31, 2010 Decision are  in Bona Fide Dispute**

68.    Rand had contended that the claims of each of the Petitioning Creditors named in both the Involuntary Petition and the "Amended" Involuntary Petition were subject to bona fide disputes.  In some instances, these disputes went to the liability as a whole, and in others, as to amount only.  These disputes are set forth and discussed in exhaustive detail in the Worksman Trial Affidavit, ¶¶ 56-92, pp. 30-49[17], a copy of which is attached as *Exhibit "G"*.

---

[17] With respect to one of the petitioning creditors, Century Sports, Inc. (a Goldmeier entity), the issue extends beyond that of a *bona fide* dispute.  As set forth the Worksman Trial Affidavit, ¶¶ 60-62, pp. 33-35, that claim is, Rand

69.     In upholding the Involuntary Petition, the Bankruptcy Court determined that the claims of the following six (6) Petitioning Creditors were not subject to any bona fide dispute as to liability or amount: Executive Importers, LLC, Century Sports, Inc., G Squared Productions, Ltd., KKG, Inc. d/b/a Kendal King Group, Sales Chief Ent. (Hong Kong) Co. Ltd. and Joseph Sandbrook.   It is respectfully submitted, the Bankruptcy Court made multiple errors of fact and law in determining that the claims of the aforementioned six Petitioning Creditors where not subject to a bona fide dispute as to liability or amount.

70.     Most obviously, the Court had applied its own interpretation of 11 U.S.C. §303 which governs involuntary petitions and provides, in pertinent part, as follows:

(b)     An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title -

(1)     by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $13,475 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

(2)     if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $13,475 of such claims.

71.     The phrase "as to liability *or amount*" was added to §303(b)(1) and (h)(1) following the phrase "bona fide dispute" by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  Bankruptcy Abuse Prevention and Consumer Protection

---

submits, contingent (in that it is premature pursuant to a contractual subordination agreement with Wells Fargo Bank) and, in any case, secured by all Rand's assets.

Act of 2005, Pub. L. No. 109-8, §§1234(a)(1)(A) and (a)(2), 119 Stat. 23 (April 20, 2005).

The amendment was intended to prevent creditors from using the bankruptcy process as a

means of coercing alleged debtors to pay legitimately disputed debts.  *See* In re Mountain

Dairies, 372 B.R. 623, 634-35 (Bankr. S.D.N.Y. 2007) (courts are wary of encouraging two

party disputes to use the bankruptcy system as a quick resolution to their disputes).

   72. Prior to the amendment, a dispute concerning the amount of the

claim was not a "bona fide dispute" as to the entire claim, under §303(b)(1).  In re Focus

Media, Inc., 378 F.3d 916, 926 (9th Cir. 2004) ("a dispute as to the amount of the claim gives

rise to a bona fide dispute only when: (1) it does not arise from a wholly separate transaction

(2) netting out the claims of the debtors could take the petitioning creditors below the amount

threshold of §303") (internal quotation marks omitted).  In re BDC 56, LLC, 330 F.3d 111,120

(2d Cir. 2003)(bona fide dispute exists "where a claim for offset arises out of the same

transaction and is directly related to the creditor's underlying claim, and, if valid, could serve

as a complete defense to that claim").  The 2005 amendments presumably eliminated the

second part of the test.  *See* 2 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* P

303.03[2][b], at 303-30 (15th rev. ed. 2006).  As a result of the amendment, *any dispute*

regarding the amount that arises from the same transaction and is directly related to the

underlying claim should render the claim subject to a bona fide dispute. Id.  The statute does

not provide that if the alleged claim is understated that there is no dispute as to the understated

portion.

   73. In addition, in considering whether or not the Petitioning Creditors'

claims are subject to bona fide disputes as to liability or amount, the Bankruptcy Court was not

required to resolve the merits of the alleged dispute, but simply had to determine whether *a* dispute exists.  *See*, *e.g.*, Platinum Financial Services Corp. v. Byrd (In re Byrd), 357 F.3d 433, 437 (4th Cir. 2004).  As set forth below and the extensive documentary exhibits admitted into evidence and upon the trial testimony, each of the Petitioning Creditors' claims was clearly disputed by Rand.   In response, the Bankruptcy Court without the assistance of an evidentiary hearing on each of the respective claims found them valid based on its interpretation of Rand's books and records.  Again, the mere existence of the disputes, regardless of who might ultimately prevail on the merits if tried, should have been sufficient to deem the respective claims disputed and to warrant the dismissal of the Involuntary and/or Amended Petition.[18]

74.     As to the question of a bona fide dispute concerning the Goldmeiers' claims, the Court need only be directed to the nature and status of the prepetition litigation before Judge Driscoll.  And in that regard, Rand would refer the Court to the very instructive language of a decision of the Southern District of New York, from In re Stuart Ross, 63 B.R. 951 (Bankr. S.D.N.Y. 1986), in which the Court stated:

> The first task of the bankruptcy court must be to review the pre-petition litigation to ascertain its procedural history and filing date posture and to determine the contentions made in it by the parties.  This objective review and analysis may be accomplished readily.  Particular attention should be paid to procedural landmarks.  Once its review is complete, the bankruptcy court is in a position to determine whether the posture of the pre-petition litigation favors or opposes a determination that a bona fide dispute exists and whether the debtor's legal position in that litigation has any genuine and objectively determinable legal merits.  This analysis fits well with the reasons offered in Congress for the addition of the bona fide dispute language to Code § 303, i.e., that the filing of an involuntary petition should not be a litigation tactic to force payment of a debt legitimately disputed.

Id. at 960-1.

---

[18]  Again, it is respectfully submitted that the Court's denial of summary judgment and/or motion to dismiss were in

(i)      Executive Importers, LLC

75.      The Goldmeiers are the principals of Executive Importers, LLC ("Executive Importers") (a Petitioning Creditor herein) which owns the real property and improvements located at 51 Executive Boulevard, Farmingdale, New York (the "Premises"), where Rand's business and assets are located.  The Bankruptcy Court held that Executive Importers, LLC held an undisputed claim on the erroneous basis that a valid written lease agreement existed between Rand and Executive Importers which provided for, among other things, the agreed upon rental rate and Rand's payment of interest and property taxes and that Rand was not entitled to a reduction in its rent under the provisions of the written lease.  TR at pp. 19-20).

76.      Contrary to the Bankruptcy Court's findings, ample evidence of multiple disputes was presented at trial including whether there is a valid signed Lease between Executive Importers and Rand.  Prior to the discovery of an alleged signed lease dated April 2007 (turned over by Wells Fargo in discovery) (Petitioning Creditors' Exhibit 33), it was always believed that no written lease existed.  In fact, an oral (month to month) lease agreement was subsumed into an informal written agreement dated August 25, 2009 and titled *Legal Agreement on Behalf of Steven and Allen Goldmeier, Mark Worksman, Rand International and Executive Importers* (the "August 25 Agreement") (*Exhibit "O"* to the Rand Trial Book) which appears to govern, among other things, the landlord/tenant relationship between the parties.   Allen Goldmeier had conceded having no knowledge of any written lease agreement and that the August 25 Agreement is "subject to interpretation" and to that Paragraph 9 therein provided that the Goldmeiers could "compel all *ongoing* corporate and real estate tax payments to be paid on a timely basis." (Goldmeier Tr. at p.

error as was its August 31, 2010 Decision Granting an Order for Relief.

169, Lines 11-25 and also see pp. 171-175). (emphasis added) It was Worksman's understanding that this paragraph, in conjunction with the obligations of the Goldmeiers set forth in paragraph 2 of the August 25 Agreement (*e.g.*, reducing the rent to $40,000), would result in the resolution of their continuing dispute as to whether or not Rand had any obligation to pay the real estate tax obligations of Executive Importers. A dispute concerning the rental obligations allegedly owed to Executive Importers was also raised in the State Court Action. The Bankruptcy Court ignored all of this and simply found that a written lease exists and is binding on the parties and accordingly, Rand was required to pay all property taxes on the premises.

77.     Moreover, in an effort to force Rand to terminate operations and to compel Mr. Worksman to surrender management of Rand to the Goldmeiers, the Goldmeiers initially caused Executive Importers to file a landlord-tenant action (the "Landlord-Tenant Action") against Rand in Nassau County. The Landlord-Tenant Action was also based upon a purported "oral" lease agreement between Rand and Executive made "on or about February, 2007". Worksman Aff., ¶33; Ex. N to the Rand Trial Book (Eviction Petition). The Landlord-Tenant Action was preliminarily dismissed as a having been filed in the wrong county. It was, thereafter, re-filed in Suffolk County, but was ultimately dismissed by the Honorable Stephan L. Ukeiley as a violation of the automatic bankruptcy stay codified in §362(a) of the Bankruptcy Code.

78.     On March 9, 2010, one day after the filing of the Involuntary Petition in which Executive Importers alleged that Rand owed it the sum of $1,161,560.84 for "rent" only, Executive Importers filed a sworn-to Petition for Eviction in the Second District Court of Suffolk County against Rand wherein Executive Importers alleged:

2.     Respondent     RAND     INTERNATIONAL     LEISURE

60

> PRODUCTS, LLC is tenant of the premises, entered into possession under an *oral rental agreement* made on or about *February, 2007* between landlord's predecessor-in-interest wherein respondent promises to pay to landlord as rent $50,000 in advance on the 1st day of each month.
>
> ***
>
> 5. …Respondent tenant has defaulted in the payment thereof and the total rent in arrears is $850,000.

(emphasis added).  *Exhibit "AA"* to the Rand Trial Book are copies of the Eviction Petition and corresponding Three Day Notice to Tenant  The total amount sought to be recovered by Executive Importers was $850,000 purportedly representing the rent owed by Rand for the seventeen month period November, 2008 through March, 2010 "with interest thereon from *November 2009*".  Contrary to the claim made by Executive Importers there was no agreement or understanding concerning the payment of any interest under the purported "oral" lease agreement and there was no demand for the payment of any real estate taxes.  See Ex. AA to the Rand Trial Book (Three Day Notice).  All of this was ignored by the Bankruptcy Court.

79.  On May 14, 2010, Executive Importers executed an Amended Involuntary Petition by which it reduced the amount owed to it from $1,161,560.84 to $1,016,032.69 and modified the nature of its claim from being only "rent" only to "rent, real estate taxes and interest."  The initial claim and the amended claim are inconsistent with Rand's understanding as to what was owed and was inconsistent with the sworn-to allegations made by Allen Goldmeier in support of the Eviction Petition.

80.  Rand's dispute was also set forth in Worksman's affidavit sworn to on February 1, 2010, filed in the State Court Action in opposition to the Motion of the Goldmeiers for an Order of Seizure and Preliminary Injunction.  In Worksman's affidavit, he had advised the

Court as follows:

> Another problem caused by the Goldmeiers, and reflecting yet additional bad-faith breaches of promise on their part, was the refusal to reduce the rent due to another Goldmeier entity, Executive Importers Inc. (see Allen Goldmeier Affidavit at note 5). The Goldmeiers promised after the closing of the Rand acquisition that if I could arrange re-financing of the Building, the rent would be lowered from $50,000 to $35,000. When I gave the proposal for re-financing to them, the Goldmeiers (literally) tore it up. This cost the company approximately another $300,000 in rent. Subsequently, they agreed to reduce the rent to $40,000 per month. Now they have reneged on that agreement as well.

See Ex. S (Worksman Affidavit) at ¶47.

81.     In sum and substance, Rand had always disputed the amount claimed by Executive Importers for unpaid rent based on the Goldmeiers broken promises. Rand also never agreed to any payment of interest. Also, as mentioned above, the Goldmeiers and Worksman never had an agreement or understanding with respect to the payment of taxes which is evidenced by it not having been demanded in the Eviction Petition. As such, the Bankruptcy Court's determination that Executive Importers' claim was not subject to a bona fide dispute was in error.

(ii)     <u>Century Sports, Inc.</u>

82.     By way of the Involuntary Petition, Century Sports (*i.e.*, Old Rand), another entity operated and controlled by the Goldmeiers asserted an indebtedness totaling *$3,331,702.41 "plus interest"* based upon a *"Secured Note"* which is presumably the Subordinated Note discussed above. By way of the Amended Involuntary Petition, Century Sports changed the nature of its claim to "Promissory Note". With regard to payment, the Subordinated Note provides, in pertinent part, as follows:

(a)     Payments of principal and interest under this Note shall be made in accordance with

this Section 1.

(i)      ...[Rand] shall make payments of interest to [Century] on the outstanding principal amount of this Note, on a monthly basis, commencing on May 1, 2007 and thereafter, on the first day of each succeeding month...

(ii)      ... beginning on the first day of the first full month following the month in which all obligations of [Rand] to [Wells Fargo Bank] under the Term Note...have been fully satisfied, [Rand] shall make payments to [Century] of principal and interest hereunder, with a minimum monthly payment of [$55,555.55]...Such payments shall be made on a monthly basis on the 1st day of each month, until the outstanding principal amount hereof, together with all interest shall have been paid.

*   *   *

2(a)  The Company hereby agrees, and Holder by its acceptance agrees, that the payment of this Note is hereby expressly made subordinate and junior in right of payment to the prior payment of the indebtedness under the Credit Agreement in accordance with that certain Subordination Agreement, of even date herewith, by and between Rand and Lender ("Subordination Agreement").

See Ex. D to the Rand Trial Book (Subordinated Note), Sec. 1(a)(i) and (ii) and 2(a).

83.      Consistent with the above, the Subordination Agreement provides as follows:

3. Payments.  Until all of the Senior Lender indebtedness has been paid in full and the Senior Lender has released its Lien in the Collateral, the Subordinated Creditor shall not, without the Senior Lender's prior written consent, demand, receive or accept any payment (whether of principal, interest or otherwise) from the Borrower in respect of the Subordinated Indebtedness, or exercise any right or permit any setoff in respect of the Subordinated Indebtedness except that the Subordinated Creditor (a) may demand, receive, and accept (or exercise any right, commence any action, or permit any setoff in respect of) interest payments due under the Subordinated Note, so long as no Borrower Default has occurred and is continuing or will occur as a result of or immediately following any such payment or action and (b) following payment in full of the Term Note, any demand, receive, and accept (or exercise any right, commence any action, or permit any setoff in respect of) payment of principal and interest due under the Subordinated Note so long as (i) such payments do not exceed $55,555.55 per month, (ii) no Borrower Default has occurred and is continuing or will occur as a result of or immediately following any such payment or action, and (iii) either (A) such payments, if made during the second, third, or

63

fourth calendar quarters of a calendar year, do not exceed Net Income (as defined in the Credit Agreement) on a year-to-date basis, or if made during the first calendar quarter of a calendar year, do not exceed Net Income for the calendar year immediately preceding such payment, (B) the Borrower would have a minimum unused Availability of $750,000 after accounting for such payments, or (C) as may expressly be agreed to by Lender in writing.

-and-

6. <u>Action on Subordinated Indebtedness</u>.  Except as otherwise permitted herein, the Subordinated Creditor will not commence any action or proceeding against the Borrower or Guarantor to recover all or any part of the Subordinated Indebtedness, or join with any creditor (unless the Senior Lender shall so join) in bringing any proceeding against the Borrower or Guarantor under any bankruptcy, reorganization, readjustment of debt, arrangement of debt receivership, liquidation or insolvency law or statute of the federal or any state government, or take possession of, sell, or dispose of any Collateral, or exercise or enforce any right or remedy available to the Subordinated Creditor with respect to any such Collateral, unless and until the Senior Lender Indebtedness has been paid in full.

See Ex. I (Subordination Agreement), Sec. 3 and 6.

84.     In determining that Century Sports' claim was not subject to a bona fide dispute, the Bankruptcy Court erroneously held that Wells Fargo had been fully paid and, thus, Century Sports was not precluded from being a Petitioning Creditor by the above-referenced provisions of the Subordination Agreement.  (See TR at p. 23)  Contrary to the Bankruptcy Court's ruling in this regard, as of the date hereof, Wells Fargo Bank has not deemed Rand's obligations under the Term Note to have been paid in full since Rand is still obligated to pay Wells Fargo alleged accrued and accruing attorney fees approximating in excess of $50,000, which Wells Fargo never disputed (See TR. at p. 71, lines 10-25).  Wells Fargo has demanded that Rand execute a full release to it of any and all claims that it may have absent to which Wells Fargo has refused to execute and file a UCC-3 termination statement of its secured lien.  Accordingly, no portion of the principal amount underlying the Subordinated Note is currently due or payable to Century.  A further dispute existed as to the calculation of interest.  The non-default interest on the unpaid balance of the

Subordinated Note was 8% and the default rate of interest was 10%.  See Ex. D to the Rand Trial Book (Subordinated Note), Sec. 1(b).  Rand has always disputed any demand for payment of the $3,000,000.00 principal obligation until the indebtedness to Wells Fargo Bank under the Term Note was fully paid and the allegedly accrued interest.  Rand testified that it did not know how Century Sports could have accrued interest of $331,702.41 "plus interest" in alleged debt obligations.  This amount is not reflected in any of Rand's books and records and Rand is not in receipt of any demand letter from Century Sports.  Thus, Century Sport's claim was contingent, unliquidated and disputed.

(iii)   G Squared Productions, Ltd.

85.   On or about November 14, 2008, Rand entered into a License Agreement with HIP Designs Limited ("HIP"), *Exhibit "DD"* to the Rand Trial Book, pursuant to which Rand was granted a license to manufacture and distribute "Animal Soup" related products. G Squared Productions Ltd. ("G Squared") was designated as HIP's "Agent" therein.  On or about February 1, 2009, and without Rand's knowledge, Steven Goldmeier signed a Sub-Licensee Agreement on behalf of Rand wherein HIP was designated as the "Licensor", G-Squared was designated as the "Licensee" and Rand was now designated as the "Sub-Licensee" from G-Squared. *Exhibit "EE"* to the Rand Trial Book. The Sub-License Agreement required an initial payment of $5,000.00 upon signature of the Agreement plus $5,000.00 payable not later than January 1, 2010.

86.   By way of the Involuntary Petition, G Squared had asserted an indebtedness totaling $5,000.00 which Rand had surmised may be part of the initial payment under the Sub-License (the nature of the purported claim was listed as "Trade Debt" which was wrong in and of itself).

87.   Rand testified, however that Mr. Goldmeier was never authorized to sign a

Sub-License Agreement and change the relationship that existed with HIP. According to Rand's books and records, copies of which are attached as *Exhibit "FF"* to the Rand Trial Book, the amount (paid quarterly) owed for unpaid royalties totaled, $38,331.21 as follows:

| Date | Royalties Owed |
|------|----------------|
| June 30, 2009 | $12,198.48 |
| September 30, 2009 | $21,467.48 |
| December 31, 2009 | $  4,665.25 |
| **Total:** | **$ 38,331.21** |

The above-referenced amounts were based on invoices for royalties generated under the November 14, 2008 License Agreement and not the February 1, 2009 Sub-License Agreement. Thus, Rand had disputed G Squared's initial claim that it was owed $5,000.00 and had argued that the initial $5,000 that was paid upon signature of the Sublicense Agreement should have been immediately refunded. Notwithstanding, Rand had testified that the $38,331.21 itself may be understated since it did not include royalties owed for the first quarter of 2010. The Bankruptcy Court erroneously determined that G Squared's claim was not subject to a bona fide dispute as Rand and G Squared were in agreement as to the amount owed as of the end of 2009. Curiously, it appeared as if G Squared had itself dropped its claim in connection with the aforementioned $5,000.00, thus recognizing the invalidity of the Sub-License Agreement, all of which was ignored by the court in addressing this claim.

88.    In his deposition taken on May 14, 2010, Allen Goldmeier was asked about his solicitation of G Squared Promotions, Ltd., relating to the Amended Involuntary Petition and his responses were as follows:

66

Q.    Your testimony today is that you were aware of only two changes (referring to the Amended Involuntary Petition) and that is the claim of Executive Importers, LLC and to your claim?

A.    In fact, I understand that one of the petitioners is increasing their claim amount.

Q.    Who would that be?

A.    That would be G Squared.

Q.    How much is he increasing his amount to?

A.    I think he petitioned for approximately 5,000 and his claim is being revised to 38,000, because it was discovered that he never received royalty reports of shipments that were made.  So now that he understands that there were shipments made of his license, the revised amount is the higher amount.

Q.    Are there any e-mails that exist between you and G Squared in which you discussed the increased amount?

A.    I sent him last night.

Q.    What did that e-mail say?

A.    It says that we found out that Worksman owes you more money than we petitioned.  One of the Worksman tricks is not to submit royalty reports to disclose the obligations that he owes this way he shows -- he leads the licensor to believe they're owed a lesser amount than what is actually owed.    It's a cheating trick of his.  Don't submit the report that shows you owe them the money and if you don't submit it then they won't chase you to pay the obligation; it's a trick.

Q.    Did G Square Promotion Limited tell you that their claim was wrong?

A. No, they weren't aware that it was wrong.  They were being tricked by Worksman because Worksman didn't submit the royalty report to him.

Q.    How did they get a copy of the royalty report that showed a greater amount owed; was that provided by you either.

A.    No, I haven't received a copy either. Although I do know there were shipments made and obviously Worksman didn't provide me a royalty report that showed he owed him another $30,000 plus.

Q.    So how did G Squared become knowledgeable that they were owed increased royalties of $38,000?

*A.    I brought it to their attention that Worksman withheld the royalty report, that he wasn't truthful in his reporting.  I said I'm going to tell you there are shipments that were made before the end of this year, and calculating the royalties due on those shipments he actually owes you more money than you*
*petitioned.*

*Q.    And you solicited them to file an amended claim for the increased amount; is that correct?*

*A.    I told them their petitioned claim is incorrect, it's understated.*

*Q.    And they agreed with you it was understated?*

*A.    I didn't get --*

*MR. KUSHNER:  They signed a petition, Doug.*

67

> *Q.    Which would make it obvious.  They agreed that it was understated?*
> *A.    I didn't see his reply but I understand, I heard that he's revising his*
> *petition to the corrected amount.*

Ex. L (Goldmeier Tr.) pp. 211, line 18 through 214, line 21.

89.    On May 13, 2010, Allen Goldmeier e-mailed G-Squared as follows: *Exhibit*

*"GG"* to the Rand Trial Book) (the Amended Involuntary Petition was signed by G Squared on

May 14, 2010):

> From: allengoldmeier@aol.com
> Date: Thu, 13 May 2010 21:00:34 +000
> To:  Brian  Hufnagelbhufnagel@forchellilaw.com;  George  gross
> george7684grossjr@rogers.com;
> George gross gg@gsquaredlicensing.com
> cc:GKushner@forchellilaw.com;
> sgoldmeier@millenniummarketingusa.com
> Subject: Re:  Rand International
> George, we have an accounts payable document dated Feb 5th that the court
> required Rand to submit and it shows Rand owes G. Squared $38,331.21.
> This would be the 2009 shipments to Dollar Tree that appears they never
> sent you the royalty report.  That's a Worksman trick often cheating.  This
> is a second default of your lic. Contract failing to report.
> Pls. sign back the amended petition at once at tmmrw morning is the
> deadline to send in.
> Rgds, Allen

90.    We can see from this exchange that Goldmeier was directly instrumental in

promoting an adjustment of this claim for purposes of the Amended Petition for the express

purpose of ensuring that the claim alleged therein was consistent with the figure that Rand would

have listed in its own books and records and as reflected in Rand's Motion for Summary

Judgment.  The purpose of this, of course, was a blind stab at making certain that, whatever G

Squared might have shown as due in its own account receivable balance, there would be no "bona

fide dispute," once its figures were *artificially* matched up to Rand's.  Notwithstanding, it was

Rand's belief that the $5,000.00 initially alleged amount was wrong, that G-Squared should refund

an initial $5,000 payment made to it, and that the royalties owed (not "Trade Debt" as reflected in

the Involuntary Petition) to G-Squared may be somewhat more than what Rand's books and

records are showing since it does not include 2010 royalty obligations.   Thus, the Bankruptcy

Court should have deemed G Squared's claim to be subject to a bona fide dispute.

      (iv)    <u>KKG, Inc. d/b/a Kendal King Group</u>

      91.    In or about November, 2008, KKG d/b/a Kendal King Group ("KKG")

had provided certain in-store marketing products and services on Rand's behalf on account of which

KKG issued Rand an invoice numbered 21789 and dated November 15, 2008 requesting payment in

the amount of $171,023.78 in connection therewith.   From the time of its receipt by Rand through

the date hereof, Rand had always disputed KKG's invoice on the grounds that, among other things,

the value of the products and services identified in the Invoice was not equal to the amounts sought

therefor, the prices for the products and services identified in the invoice had not been agreed to in

advance of said products and services identified being provided by KKG, and/or that certain of the

products and services identified in the Invoice had not, in fact, been provided by KKG and/or were

not agreed to by Rand.   Rand communicated its protests and objections to KKG.

      92.    Between February, 2009 and June, 2009, and without prejudice to its protests

and objections with regard to KKG's invoice, Rand had always made timely payments to KKG

totaling $120,000.00 leaving an alleged open balance of $51,023.78 under KKG's invoice.

      93.    By way of the Involuntary Petition and Amended Involuntary Petition, KKG

asserted an indebtedness totaling $51,023.78 subject to Rand resolving the above identified disputes.

In March, 2010, Rand had believed that the pending disputes with KKG was settled for the sum of

$7,500.00 and had written to Mr. King, CEO of KKG to confirm:

> This letter will formalize our Agreement of Settlement, which was confirmed by you via email on 2/9/2010 with Sean Smith of Getzler Henrich and Associates.  Said email referenced a phone call on 2/8/2010 with Sean Smith of Getzler Henrich and Associates, regarding a Kendall King invoice #21789 dated 11/15/1008 to Rand International in the amount of $51,023.78.  Per verbal agreement and subsequent emails, Kendal King Group has agreed to settle this invoice for the amount of $7,500.00 in 3 equal payments of $2,500.00.  The first payment will occur on or before March 31, 2010, the second on or before April 30, 20101 and the third payment will occur on or before May 31, 2010.  (Exhibit "HH" to the Rand Trial Book)

94.     In fact, at trial, KKG testified as follows:

Q.  All right.  How long have you had a business relationship with the Goldmeiers?

A.  This is approximate, but I'm going to say we had done some business back in 2007, was when we first started, that's approximate.

Q.  In the course of your transactions with the company since Mr. Worksman took over, have you had any disputes about amounts due?

A.  Yes.

Q.  Can you give some examples?

A.  The dispute of the $51,023.78 that are still remaining.

Q.  So that amount –

A.  Yes.

Q.  That amount is disputed.

A.  Yes.  (TR. At p. 87, lines 9-23)

95.     In determining that KKG's claim was not subject to a bona fide dispute, the Bankruptcy Court held that KKG invoice of November 15, 2008 was binding as Rand had made the $120,000.00 payment to KKG and had carried the $51,023.78 balance on its books, and that the proposed $7,500.00 settlement was never consummated.  (See TR at pp. 24-26).

96.     It was common practice at Rand to talk to its vendors to discuss any disputed claims so as to keep all lines of communication open.  But for the disputes that had been discussed with Mr. King and which he recognized that he would not have so readily agreed to reduce KKG's

claim to $7,500.00.  Copies of various documents evidencing the foregoing are reflected in *Exhibit "HH"* to the Rand Trial Book.  (Also see the Trial Affidavit of Sean Smith at ¶3).  In this regard, neither Mr. King himself nor any other Petitioning Creditor disputed the sworn testimony of Sean Smith of Getzler Henrich & Associates, LLC concerning his discussions with Mr. King regarding the settlement of the disputed debt and Mr. King's advice (via e-mail) to Mr. Smith that he believed that creditors would receive nothing if the Involuntary Petition were successful.  (See Trial Affidavit of Sean Smith).

       (v)    <u>Sales Chief Ent. (Hong Kong) Co. Ltd.</u>

       97.    Sales Chief Ent. (Hong Kong) Ltd. ("<u>Sales Chief</u>") is engaged in the business of supplying, among other items, scooters, folding scooters and 4 wheel Quad vehicles.  According to the books and records of Rand, Sales Chief had invoiced Rand the sum of $1,210,471.01  for goods supplied between the period July 28, 2008 through November 24, 2009.  See *Exhibit "MM"* to the Rand Trial Book.  From the time of Rand's receipt of the respective Sales Chief invoices, through the date hereof, Rand had disputed Sales Chief's invoices on the grounds that, among other things, said invoices failed to include credits due to Rand.  Rand always communicated its protests and objections to Sales Chief and Sales Chief always acknowledged that it was aware of our disputes.  It was customary and normal for Rand and Sales Chief to work out its differences with Rand since Sales Chief is its major supplier of product from China, and, therefore, invaluable to Rand's continued success. By way of example only, on June 6, 2009, Rand had sent the following e-mail to Ellen Liu of Sales Chief advising as follows:

       Dear Ellen,
       Thank you for your response.

I have not been able to respond to your E Mails as I am constantly up dated with new information.

Steven and Peter visited with you in China and both came back without resolve (sic) to this problem.

You and Allen communicate regularly and we still do not have this problem solved.

I now step back in and review the records and advise you that the defect rate is over 10%.  Allen will confirm this.

I THINK YOU AND I WERE ON THE RIGHT TRACK WHEN WE SPOKE ABOUT RE CYCLING THE QUADS RETURNS.

THE SETTLEMENT NEEDS TO BE REVISITED TO RE COUPE (sic) THE ADDITIONAL DEFECTS THAT ALLEN WILL ADVISE YOU.

Allen is busy pointing the finger, he didn't do his job and forgot to advise you of the proper defect rate Rand is holding.

98.      As a basis for its signing of the Involuntary Petition, Sales Chief

identified the sum of $972,679.16 as owed to it.  Rand could not reconcile, from its books and

records as to how this amount is alleged to be owed by Rand nor what years of the relationship it

refers to (Worksman Trial Affidavit at ¶81).  Rand believed that some of the credits owed to Rand

from Sales Chief may have been accepted by Sales Chief in reducing its claim to $972,679.16 and

that Sales Chief had been continuing charging Winston, a competitor of Rand, an extra $1.00 per unit

for each quad sold by Sales Chief to Winston and that such a practice continues to date which

materially effected the amount claimed by Sales Chief (Worksman Trial Affidavit at ¶81).

Worksman also testified that the asserted amount does not include chargebacks for the 2009 season

owed to Rand which was confirmed in Ms. Liu's Trial Affidavit (See ¶13 of Ms. Liu's Trial

Affidavit).  Copies of the above-referenced e-mail along with a summary of chargebacks, which

totaled not less than $1,309,602.59 that Rand informed Sales Chief of and which were considered by

the Bankruptcy Court are reflected as combined *Exhibit "NN"* to the Rand Trial Book. At trial the

following exchange took place:

> Mr. Kushner:  All right.  No further questions, Your Honor.
> The Court:  All right.  Let me ask.  Ms. Liu, if Sales Chief sold merchandise in 2009 that exceeded the four percent defective credit limit, would the value of that merchandise then reduce the amount that Sales Chief is owed by Rand, or would Sales Chief have to replace the items with the purchaser?
> The Interpreter:  Your Honor, can you repeat that question?
> The Court:  All right.  Let me try it again.  You said that there's a four - - there's an agreement that if any defective merchandise sold in 2009 was greater than four percent, then Sales Chief would have to take over for that merchandise, correct?
> The Witness:  Yes, for the whole year.
> The Court:  And by take over, does that mean reduce the amount that Rand owes or replace the defective merchandise?
> The Witness:  Your Honor, she said that there has been talk about those things prior to 2009.
> The Interpreter:  And you know, I've kind of -- I need to repeat that, yeah.
> Ms. Liu:  Can I answer the question in English?
> The Court:  No.
> Ms. Liu:  No?  Okay. Then --
> The Witness:  She's clarifying your question is that how do they take over the responsibility for the return merchandise beyond four percent.
> The Court:  Yes, that was my question.
> The Witness:  She said they had talked about her taking over, but as far as how they haven't discussed that.
> The Court:  So they don't --
> The Witness:  And the reason --
> The Court:  Go ahead.
> The Witness:  It's because in prior to this case, there has been many years of business between Sales Chief and Rand.  We have used merchandise to -- as an offset for the return merchandise, and there's also credit to debit entries mechanism.
> The Court:  All right.  Thank you.

[See TR pp. 187-188, lines 20 to end and P.189, lines 1-6]

99.    Notwithstanding the above testimony of credits due to Rand for the 2009

calendar year, the Bankruptcy Court held that Rand had not demonstrated any bona fide dispute regarding Sales Chief's claim because it was not disputed that Rand had a right to a credit against the amounts reflected on its books as owing to Sales Chief. (See TR at pp. 17-18). The Bankruptcy Court's finding was wrong.

100. Rand's attempts to reconcile the amounts owed to Sales Chief, Mr. Worksman (together with Leslie Turbowitz) met with Ellen Liu who advised Mr. Worksman that Sales Chief had signed the Involuntary Petition solely on the request of Allen Goldmeier without consulting with any counsel and without verifying any of the allegations set forth in the Involuntary Petition. She had suggested that their differences relating to the disputed amounts claimed be resolved in a business-like fashion without resorting to expensive litigation. In this regard, neither Ms. Liu nor any other Petitioning Creditor disputed the sworn testimony of Mr. Turbowitz concerning those discussions (all conducted in English) with Ms. Liu and Mr. Worksman regarding the disputed and unsettled nature of the obligations between and among Rand and Sales Chief. (See Trial Affidavit of Leslie Turbowitz admitted into evidence).

101. At their meetings, Rand had agreed that it would again provide Sales Chief with copies of all of Rand's documentation evidencing its claim for credits and chargebacks to be applied to the disputed indebtedness and that they would meet to come to a mutual reconciliation of the indebtedness. In furtherance thereof, Eileen Liu of Sales Chief had acknowledged (again, in emphasis) that the disputed indebtedness reflected in the Involuntary Petition did not accurately set forth its actual claim, if any, against Rand and that Sales Chief would agree to withdraw as a Petitioning Creditor under the Involuntary Petition. She had requested to be provided with a schedule of the chargebacks for 2009, the same as had been done for 2007 and 2008, and that the

claim would be resolved.   Rand continued to do business with Sales Chief in 2010 with this understanding.

102.    The Bankruptcy Court also committed reversible error by allowing (over the objection of Rand) Ms. Liu  to testify at trial using a "personal friend" (and not a court authorized interpreter) as her interpreter after she had filed a personal Declaration and made utterances in open court evidencing her mastery over the English language.  In fact, Mr. Turbowitz filed an affidavit in Court in which he proffered the summary of a conversation held in English between Mr. Worksman and Ms. Liu:

> In April 2010, I travelled to Shanghai, China to attend a bicycle show with Mark Worskman, the Managing Member of Rand. In the course of my attendance at the bicycle show, and in particular, on April 29, 2010, I attended a 9:00 a.m. breakfast meeting with Mr. Worksman and Ellen Liu, whom I understood to be an owner of Sales Chief Enterprise Co, Ltd. a/k/a Sales Chief Ent. (Hong Kong) Co., Ltd ("Sales Chief"), one of the petitioning creditors herein.

> Among the other things discussed at this meeting was the status of the accounts receivable due from Rand to Sales Chief.  *In the course of that discussion, Ms. Liu made it clear that she understood that the outstanding billing statements of Sales Chief represented a gross figure, and did not account for various chargebacks or credits for defective goods.*  She made it clear that the Sales Chief billing statements would be the subject of further discussion to address the return of defective goods and chargebacks. She advised Mr. Worksman to provide to her information/documentation relating to the chargebacks or credits for defective goods which she would review.  I recall Mr. Worksman advising Ms. Liu that there was money owed from Sales Chief on account of shipments of "quads" made to another company for which Rand was entitled to certain credits from Sales Chief.  It was clear to me from the breakfast meeting that Ms. Liu wanted to try to resolve the billing dispute with Rand in an amicable, business-like fashion.  The meeting ended with Mr. Worksman assuring Ms. Liu that he would send supporting summaries of the chargebacks/credits that Rand was entitled to.

> I have reviewed the amended involuntary petition filed in this case and noticed that the claim asserted by Sales Chief is in the range of the gross billing figure discussed at the meeting, and does not account for the aforementioned chargebacks or adjustments.

Without explanation, the Bankruptcy Court entirely disregarded the uncontroverted testimony of Mr. Turbowitz.

(vi)  Joseph Sandbrook

103.  Joseph Sandbrook had provided design services to Rand.  By way of the Involuntary Petition, Mr. Sandbrook had initially asserted an indebtedness totaling $19,800.00.  The Bankruptcy Court held that, since Rand's books and records reflected an indebtedness to Mr. Sandbrook in excess of $19,800.00, Mr. Sandbrook's amended claim in the reduced amount of $18,500 was not subject to a bona fide dispute.  (See TR at pp. 18-19).

104.  Mr. Sandbrook's claim was as follows: (*Exhibit "OO"* to the Rand Trial Book are copies of 5 invoices produced by Joseph Sandbrook evidencing a debt of $37,800.00 owed to it:

| Invoice Date | Invoice Amount |
|---|---|
| March 16, 2009 | $9,000.00 |
| April 18, 2009 | $9,000.00 |
| June 3, 2009 | $9,000.00 |
| July 14, 2009 | $9,000.00 |
| September 17, 2009 | $1,800.00 |
| Total: | $37,800.00 |

105.  According to Rand's books and records, the amount owed totals, at most, only $18,500.00 as follows:

| Invoice Date | Invoice Amount |
|---|---|
| April 18, 2009 | $500.00 |
| June 3, 2009 | $9,000.00 |
| July 14, 2009 | $9,000.00 |
| **Total:** | **$18,500.00** |

Copies of Rand's Voucher History Report and the above-listed invoices are attached as *Exhibit "PP"* to the Rand Trial Book.  The difference in the amount is that the March 16, 2009 invoice of

76

$9,000.00 was paid and $8,500.00 of the April 18, 2009 invoice was paid.  Unfortunately, Rand was

not aware of an additional $1,800.00 being asserted by Mr. Sandbrook on September 17, 2009 which

amount was not reflected in Rand's books and records.  Thus, Rand's books and records should have

reflected a balance owed of $20,300.00.

106.    The amount which appears in the Amended Involuntary Petition was reduced

to $18,500, due to a call made by the Goldmeiers to Mr. Sandbrook, which is the amount initially

listed in Rand's books and records until a copy of yet a new invoice appeared.  Mr. Sandbrook never

produced any documentation to support a claim reduction.  Could it possibly be denied that this

claim is subject to bona fide dispute, when clearly Sandbrook believes his claim to be higher than

listed on the Petition?  A dispute exists whether Rand alleges more is owed or less is owed than what

the petitioning creditor may allege.  Thus, this amount is in dispute.

**G.    Immediate and Irreparable Harm Will Result Unless a Stay is Granted
        and No Prejudice or Harm Will Be Suffered as a Result of the Stay**

107.    Failure to grant a stay would cause irreparable and immediate harm to Rand

and its creditors in the form of the immediate termination of its operations and the appointment of a

Chapter 7 Trustee to liquidate all of its assets.  Century Sports Inc., a Petitioning Creditor and an

entity controlled by the Goldmeiers (hereafter defined) has asserted a lien against all of Rand's

assets. The Goldmeiers have acknowledged that they will not consent to Rand's use of cash collateral

in a bankruptcy proceeding and that there is no likelihood of any distribution to creditors if the

involuntary case was converted to a chapter 7 or chapter 11 case.  Thus, in the event that an Order for

Relief is entered prior to a determination on Rand's appeal, the outcome of the appeal may be

rendered moot.

108.     No substantial harm or prejudice would be suffered by any of Rand's creditors and/or any other parties in interest if the requested stay pending the outcome of the Appeal was granted.  To the contrary, the entry of a stay would permit Rand to continue to operate its business and to pay its creditors in the ordinary course whereas, if an Order for Relief under chapter 7 is entered, Rand's operations will immediately terminate.  It is not disputed, but rather was acknowledged by the Petitioning Creditors, that Rand's unsecured creditors would likely receive no recovery in a chapter 7 liquidation on account of the substantial secured obligations owed to the Goldmeiers and the entities under their control.  At a minimum, the balance of potential prejudices weighs heavily in favor of Rand as it stands to lose all of its assets and operations if an Order for Relief under chapter 7 is entered prior to a determination on its Appeal.

**H.     Public Interest**

109.     Rand respectfully submits that the public interest is not implicated in the instant case.  However, because of the extraordinary ramifications of the entry of an involuntary Order for Relief under chapter 7 of the Bankruptcy Code, it would seemingly be within the best interests of public policy and in the best interest of the creditors of Rand to stay such an Order so as to permit a comprehensive review of the basis upon which this Order was signed;

**I.     No Bond Should Be Required**

110.     Bankruptcy Rule 8005 gives the Court discretion to require a bond or other security for a stay pending appeal.  Rand respectfully submits that a bond is neither necessary nor appropriate in this case.  The Appeal, which Rand has requested be heard on an expedited basis, will not cause material delay or present any threat of loss to Rand's bankruptcy estate and/or its creditors.  Moreover, the Order appealed from is not a money judgment and the grant of a stay pending appeal

does not carry a quantifiable financial consequence to any party to the Appeal. Accordingly, no bond or security should be required as a condition to the stay.

## <u>CONCLUSION</u>

111.    For the reasons set forth above, Rand respectfully requests that the Motion be granted in its entirety and that the Court grant Rand such other and further relief as it may deem just and proper.

112.    Rand made one prior application for the relief sought herein in the Bankruptcy Court as discussed above.

113.    Because there are no novel issues of law presented by this motion, Rand respectfully requests that this Court waive the requirement that they file a separate brief and/or memorandum of law in support of this Motion.

Dated: New York, New York
      September 13, 2010

                        **PICK & ZABICKI LLP**
                        Counsel to the Debtor-Appellant


               By:      **/s/Douglas J. Pick**
                        Douglas J. Pick
                        369 Lexington Avenue, 12th Floor
                        New York, New York 10017
                        (212) 695-6000